Kimberly Clark Corporation, : 
          Petitioner : 
          : 
          : 
        v. : 
          : 
Workers' Compensation Appeal : 
Board (Bromley), :   No. 656 C.D. 2016
        Respondent :   Submitted: October 14, 2016


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
             HONORABLE ANNE E. COVEY, Judge
             HONORABLE DAN PELLEGRINI, Senior Judge

OPINION BY
JUDGE COVEY                       FILED: May 4, 2017


      Kimberly Clark Corporation (Employer) petitions this Court for review of the Workers' Compensation (WC) Appeal Board's (Board) March 30, 2016 order affirming the Workers' Compensation Judge's (WCJ) decision granting Sharon R. Bromley's (Claimant) Fatal Claim Petition for Compensation by Dependents of Deceased Employees (Fatal Claim Petition). Essentially, there are two issues before this Court: (1) whether Claimant met her burden under Section 301(c)(1) of the WC Act (Act)[1] of proving that her deceased husband Donald J. Bromley's (Bromley) injury and/or death were caused by exposure to chemicals in Employer's workplace and, (2) whether the WCJ issued a reasoned decision.[2] After review, we affirm.

_____

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 411(1).

[2] Employer presented six issues for this Court's review: (1) whether Claimant met her burden under Section 301(c)(1) of the Act of proving that Bromley's injury and/or death were caused by exposure to chemicals in Employer's workplace; (2) whether Claimant sustained her factual burden of proving that Bromley was exposed to various workplace chemicals, and that such exposure rose to the level of a hazard; (3) whether Claimant sustained her burden under Section 301(c)(1) of the Act of proving medical causation between Bromley's workplace exposure and his injury and/or death; (4) whether the WCJ erred by overruling Employer's objection during Barry L. Singer, M.D.'s June 25, 2010 deposition; (5) whether Claimant met her burden under Section 301(c)(1) of the Act of proving Bromley's exposure within 300 weeks of his injury and/or death;

Employer operates a paper manufacturing business which produces napkins, toilet tissue and paper towels. *See* Reproduced Record (R.R.) at 12a-13a. Bromley was employed as one of Employer's Chester plant electricians from 1973 to 2005, during which time he was exposed to various chemicals used in Employer's production. In the summer of 2005, Bromley was diagnosed with metastatic bladder cancer which caused his death on June 23, 2006.

On August 4, 2008, Claimant filed a Claim Petition for WC (Claim Petition), seeking lost wages from August 11, 2005 through June 23, 2006, plus medical benefits and counsel fees arising from Bromley's work injury, which was described as bladder cancer, multiple pulmonary metastatis and asbestos-related pleural plaques. *See* Certified Record (C.R.) Item 4. On that same date, Claimant filed a Fatal Claim Petition for Compensation By Dependents For Death Resulting From Occupational Disease (Fatal OD Claim Petition) under Section 301(c)(2) of the Act, alleging that Bromley's death was due to an occupational disease - metastatic bladder cancer - caused by exposure to carcinogens during the course and scope of his employment with Employer. *See* C.R. Item 1. Claimant also filed the Fatal Claim Petition pursuant to Section 301(c)(1) of the Act seeking widow's benefits[3]

---

and, (6) whether the WCJ issued a reasoned decision. Because the first five issues relate to whether Claimant met her burden under Section 301(c)(1) of the WC Act, they are all subsumed thereunder.

[3] Under Section 307(2) of the Act, 77 P.S. § 561(2), widows are entitled to 51% of the decedent's wages, not to exceed the statewide average weekly wage. Claimant's general eligibility is undisputed. The WCJ found:

> [Claimant], age 62 as of her testimony, is clearly [eli]gible to receive benefits as a widow; no dispute exists as to her status. Here, there was a forty-one (41)[-]year marriage (date of marriage, April 20, 1965) during which [Claimant and Bromley] lived together; they were living together as of the date of [Bromley's] death. [Claimant] is the sole dependent entitled to benefits. Three children were born of the marriage, but all are above the usual entitlement age, and none are disabled; none were dependent on [Bromley] for support.

WCJ Dec. at 1.

due to Claimant's work-related death. *See* C.R. Item 10. In all of the Petitions, Claimant averred that Bromley's date of injury/last date of employment was August 11, 2005. Employer denied the allegations in each of Claimant's Petitions and raised various affirmative defenses. *See* C.R. Items 3, 6, 12.

WCJ hearings were held on September 17, 2008, January 7, June 1 and September 16, 2009, and January 20, April 19, July 26 and October 25, 2010. By February 4, 2011 decision, the WCJ granted the Fatal Claim Petition and ordered Employer to pay Claimant benefits based upon Bromley's $1,738.08 average weekly wage, commencing on June 23, 2006, the date of Bromley's death (Original Decision). The WCJ also directed Employer to pay 10% interest on all deferred WC payments, $3,000.00 toward Bromley's funeral expenses, plus litigation costs and attorney's fees. Employer appealed to the Board which, on August 9, 2013, held that, although the WCJ found that Bromley's death was due to work-related exposure to carcinogens, since the WCJ did not state whether the conclusions were made pursuant to Section 301(c)(1) or 301(c)(2) of the Act, the Board could not determine whether substantial evidence supported the WCJ's award. Accordingly, the Board remanded the matter for the WCJ to specify whether he had awarded the benefits pursuant to Section 301(c)(1) of the Act or under Section 301(c)(2) of the Act.[4]

On remand, the WCJ conducted additional hearings on March 7 and September 10, 2014. On September 16, 2014, the WCJ reaffirmed his Original Decision and added that "**Claimant has met the burden of proof required under Section 30[1](c)(1) of the Act**, with benefits to [Claimant] being appropriately

---

[4] Under Section 301(c)(2) of the Act, claimants who establish that certain occupational diseases enumerated in Section 108 of the Act, added by Section 1 of the Act of October 17, 1972, P.L. 930, 77 P.S. § 27.1, are entitled to a rebuttable presumption that the diseases are work-related or "arose out of and in the course of [] employment[.]" Section 301(e) of the Act, 77 P.S. § 413. Section 301(c)(1) of the Act does not allow for a similar presumption. *See Pawlosky v. Workmen's Comp. Appeal Bd.*, 525 A.2d 1204 (Pa. 1987).

granted as entered in the [O]riginal Decision." WCJ Remand Dec. at 3 (emphasis added). The WCJ specifically held: "The instant matter meets the provisions of Section 301(c)(1) [of the Act] as **a repetitive/cumulative[-]type injury by way of exposure to carcinogenic agents in the workplace over an extended period of time** resulting in bladder cancer and death[.]" WCJ Remand Dec. at 3 (emphasis added). Employer appealed from the WCJ's remand decision to the Board. On March 30, 2016, the Board affirmed the WCJ's remand decision. Employer appealed to this Court.[5]

> Initially, Section 301(c)(1) of the Act provides, in relevant part:
>
> The terms 'injury' and 'personal injury,' as used in this [A]ct, shall be construed to mean **an injury to an employe**, regardless of his previous physical condition, . . . **arising in the course of his employment and related thereto, and such disease** or infection **as naturally results from the injury** or is aggravated, reactivated or accelerated by the injury; **and** wherever death is mentioned as a cause for compensation under this [A]ct, it shall mean only **death resulting from such injury** . . . **, and occurring within three hundred weeks after the injury**.

77 P.S. § 411(1) (emphasis added). Accordingly, "[i]n a fatal claim proceeding, the surviving family member bears the burden of proving that the decedent sustained an injury in the course and scope of employment and that the decedent's death was causally related to the work-related injury." *J.D. Landscaping v. Workers' Comp. Appeal Bd. (Heffernan)*, 31 A.3d 1247, 1252 (Pa. Cmwlth. 2011).

"[T]he word 'injury' . . . is given no express statutory meaning" in Section 301(c)(1) of the Act, and "does no more than state that an injury is an injury."

---

[5] "On review[,] this Court must determine whether constitutional rights were violated, errors of law were committed, or necessary findings of fact were supported by substantial competent evidence." *Stepp v. Workers' Comp. Appeal Bd. (FairPoint Commc'ns, Inc.)*, 99 A.3d 598, 601 n.6 (Pa. Cmwlth. 2014).

Employer filed with this Court a request for supersedeas pending the appeal. By July 1, 2016 memorandum and order, this Court denied the supersedeas request.

4

*Pawlosky v. Workmen's Comp. Appeal Bd.*, 525 A.2d 1204, 1209 (Pa. 1987). However, the term "has been broadly defined to encompass **all work-related harm** including 'any hurtful or damaging effect which may be suffered by anyone.'" *Jackson Twp. Volunteer Fire Co. v. Workmen's Comp. Appeal Bd. (Wallet)*, 594 A.2d 826, 828 (Pa. Cmwlth. 1991) (emphasis added) (quoting *Pawlosky*, 525 A.2d at 1209). Thus, our courts have declared that an "injury" under Section 301(c)(1) of the Act need not arise from an accident or specific physical bodily trauma, but can include a disease not statutorily defined as an "occupational disease" under Section 301(c)(2) of the Act or The Pennsylvania Occupational Disease Act (the ODA),[6] that is caused by exposure to a job-related hazard. *See Pawlosky*; *see also McCullough v. Xerox Corp.*, 581 A.2d 961 (Pa. Super. 1990); *Standard PA Practice 2d* (2011) §§ 167:220, 167:241. Specifically, "[b]ased on [the] *Pawlosky*[] [Court's] broad interpretation of 'injury' in [S]ection 301(c)(1) [of the Act], **it is now well settled that a claimant can establish a right to benefits for an 'injury' in the nature of a work-related disease[,]"** *i.e.*, **a disease as an injury claim**.[7] *Brockway Pressed*

---

[6] Act of June 21, 1939, P.L.566, *as amended*, 77 P.S. §§ 1201-1603.

[7] Accordingly, there is no support for Employer's argument that bladder cancer "is not an alleged injury" and "is not a condition that falls within the statutory meaning of" Section 301(c)(1) of the Act, or that "it can only be classified as an occupational disease under [the ODA.]." Employer Br. at 32.

When the ODA was enacted in 1939, occupational diseases were listed therein that were not covered by the Act. However, in 1972, Sections 108 and 301(c) of the Act were amended to include occupational diseases as compensable injuries. The amendments covered only disabilities due to exposures after June 30, 1973, whereas the ODA remained in force for older claims. *See* David B. Torrey & Andrew E. Greenberg, *Workers' Compensation: Law & Practice* §§ 5:1, 5:2, 5:10 (3rd ed. 2008).

> The [ODA] remains unrepealed. Obviously, one of the main reasons for not repealing it was to make clear that the [ODA] was to remain in force with respect to occupational diseases contracted prior to the effective date of the 1972 disease provisions of the [Act]. It is worth noting that the diseases covered by the [ODA] are essentially similar to those provided for in [S]ection 108 of the [Act].

*Pawlosky*, 525 A.2d at 1210 n.9.

*Metals v. Workers' Comp. Appeal Bd. (Holben)*, 948 A.2d 232, 234 (Pa. Cmwlth. 2008) (emphasis added).

## I.   Whether Claimant met her burden under Section 301(c)(1) of the Act.

Employer argues that Claimant failed to meet her burden under Section 301(c)(1) of the Act of proving that Bromley's death was caused by his exposure to chemicals in the workplace within the 300 weeks preceding his death. We disagree.

In support of her Fatal Claim Petition, Claimant testified that, with the exception of a broken leg in 1964, hernia surgery in 1993 and a diabetes diagnosis approximately three years before his death,[8] *see* R.R. at 400a, Bromley was "very healthy" up to the time that he noticed blood in his urine in May or June 2005. R.R. at 384a. Claimant recounted that, because Bromley's physician thought he had a

---

Moreover, our Superior Court specifically stated that,

> failure to meet the definition of occupational disease [under Section 301(c)(2) of the Act] does not exclude a claimant from compensation under the [WC] system. *See generally Pawlosky.* . . . Such **definitions are merely procedural means of creating a non-conclusive presumption** that an injury was work-related. Failure to establish the presumption [under Section 301(c)(2) of the Act] is not dispositive; **the claimant may still go forward in making out a case for [WC benefits under Section 301(c)(1) of the Act] absent the presumption**.

*McCullough v. Xerox Corp.*, 581 A.2d 961, 964 (Pa. Super. 1990) (emphasis added). Thus, disability due to an occupational disease that is not specifically listed in the ODA or Section 108 of the Act, 77 P.S. § 27.1, as incorporated by Section 301(c)(2) of the Act, may still be compensable, as long as the requisite causation is established. *Pawlosky.*

Finally, Section 444 of the Act, added by Section 6 of the Act of October 17, 1972, P.L. 930, provides, in pertinent part, that "any person may pursue, in the alternative, a claim for compensation under this [A]ct and a claim for compensation under [the ODA]." 77 P.S. § 1000. Accordingly, "[WC b]enefits for disabilities due to occupational diseases may be claimed under either [the ODA or the Act,] or under both in the alternative." *Oscar Mayer & Co. v. Workmen's Comp. Appeal Bd.*, 425 A.2d 879, 879 (Pa. Cmwlth. 1981).

[8] Claimant articulated that Bromley's diabetes was controlled with diet and medication (Glucophage). *See* R.R. at 384a, 399a, 405a.

prostate infection, Bromley was prescribed a six-week course of Cipro. *See* R.R. at 407a. Bromley underwent diagnostic testing of his bladder in June 2005, and surgery to remove a tumor on August 11, 2005. *See* R.R. at 403a-404a.

Claimant explained that Bromley served his four-year electrician apprenticeship at Sun Ship Building and Dry Dock (Sun Ship) in the 1960s. He worked for Scott Paper's foam division until approximately 1971. Thereafter, he was employed at DuPont for approximately six months. In 1973, he returned to Scott Paper at Employer's Chester facility. *See* R.R. at 362a-364a.

Claimant related that Bromley worked at Employer's plant until August 2005, but returned to work for Employer for an additional 40 hours in February 2006 in order to retire with seven paid vacation weeks. *See* R.R. at 400a-401a. She testified that, although she did not have first-hand knowledge of Bromley's working conditions, she observed that the entire time he worked for Employer, "[h]is clothes would have little holes in them," and "he would have die [sic] on his hands when he came home." R.R. at 369a. She also recalled that there regularly was paper dust and dye on his work clothes, the latter of which she could never get out. *See* R.R. at 370a-373a. Claimant could not specify how often Bromley came home with dye on his hands or clothes, only that "[he] went to work, came home and sometimes he had die [sic] on it and sometimes he did not," but it happened frequently enough that she just expected it. R.R. at 372a.

Further, Claimant described that Bromley smoked for approximately one year, but he quit in 1965 when Claimant became pregnant, and he never smoked thereafter. *See* R.R. at 392a-395a. She reported that although Bromley's father smoked at home while Bromley was growing up, Bromley's mother required his father to smoke outside. *See* R.R. at 391a, 395a-397a.

Robert Bonkowski (Bonkowski) testified that he has been an electrician for Employer since 1971. *See* R.R. at 5a, 32a. He met Bromley during their

7

electrician apprenticeships at Sun Ship in the 1960s. *See* R.R at 46a. He related that Bromley started the four-year program before he did, but they overlapped three of those years, and they worked together at Employer's facility from 1973 until Bromley retired. *See* R.R. at 46a.

Bonkowski described that Employer's facility consists of six major buildings housing four types of operation areas – a powerhouse, pulp delivery, tissue mill, and finishing/distribution – all of which he has worked in over the years. *See* R.R. at 6a-7a. Bonkowski reported that the electricians were charged with keeping the process running so, "[i]f it was part of the process, [they] worked on it." R.R. at 24a; *see also* R.R. at 14a.

Bonkowski stated that Employer's electricians initially worked from a central shop and were assigned around the plant as needed, to regularly repair and test machines, and to conduct "capital work" like new machine wiring, lighting, construction, clean-up, etc.[9] R.R. at 9a. Bonkowski specified that he and Bromley were leaders from 1993 to 1997, meaning that they also purchased needed materials, conducted safety meetings and created electrician job assignments. *See* R.R. at 8a, 11a. Moreover, Bonkowski recalled that when the central shop was dismantled in 1997 and the electricians were "assigned to individual assets" or families (*i.e.*, given specific area assignments), he was assigned to tissue mill 17 and Bromley was assigned to the cogeneration facility (CCF) until 2000, when Bromley replaced the napkins department electrician. R.R. at 8a; *see also* R.R. at 29a, 32a-33a, 43a.

Bonkowski articulated that, as electricians who worked throughout Employer's facility, he and Bromley came into contact with the various chemicals used in Employer's processing. *See* R.R. at 14a, 23a. He expounded:

---

[9] Bonkowski testified that jobs were assigned by work order, horn call or shift supervisor's verbal request. *See* R.R. at 14a.

There was [sic] chemicals that were taken away from us because they were called -- considered hazardous. One of them was xylene, was a cleaning solvent that was used on the machines. We were exposed to Tap Free that was taken [] away from the mechanics [in the 1980s], because it was considered dangerous.[10] Tazcon (ph) was a penetrating oil that was removed, a lot of them just disappeared. I don't know if you can say they were removed, but I know our cleaning tank, where we had a wash-up tank in the shop that had the One-One-One in it, and I know that was removed.

Q. A cleaning solvent One-One-One?

A. Yeah. It had a code One-One-One on it. I don't know what the breakdown is but that was considered bad. We were exposed to -- I guess we were exposed to [polychlorinated biphenyl (]PCBs[)], which were replaced, I guess, with number 10 transformer oil. PCBs that we used to check test and work a lot with other vendors and stuff like that. I mean, even the processes were changed, they took kerosene out of the plant. They took formaldehyde out of the plant [in the late 1980s]. They took milk of lime, which was used for bleaching [recycled paper], which was chlorine and lime and it was mixed, and it was called milk of lime that was pumped out the plant, it was a bleach plant, actually we had a bleach plant there [until the mid-1990s]. They had chlorine tanks, tanker trucks, train tanks, I guess you would call them. That was full of chlorine.

Q. And you would come in contact with that as an electrician?

A. Sure, because we had to disconnect motors, replace[] rotted conduits, seal tights, the pipe fighters [sic] might be pulling a pump. So in order to get the pump out, we had to pull the motor out to make room for the new pump [to go] in, and the mechanics would have to draw tap the motor bases and things like that, so yeah.

Q. And when things would either disappear or be directly pulled, were there ever any safety meetings with management where that would be discussed?

---

[10] Bonkowski clarified that although Employer no longer stocked Tap Free or Tap Magic, the electricians all had cans of it that they continued to use thereafter until it was gone. *See* R.R. at 40a.

A. No, not really. Just went out and did your job.

Q. Is there any particular manager that would ever give you any direction at all in safety, in dealings with these chemicals that you recall?

A. I would say no, not really. Now, they did take asbestos brakes out of the areas [in the early 1990s]. We did a lot of asbestos brakes, transfer asbestos brakes, we used to take care of the elevators. The freight elevators, they were all asbestos brakes, and we would repair the motors in the shop with asbestos brakes, blow out the motor and just blow them out in the shop, and we didn't have any special HIPAA [sic] vacuum cleaner like they have today.

R.R. at 15a-17a; *see also* R.R. at 19a-23a, 42a.

Bonkowski described that, until the xylene tank was removed from the plant, he and Bromley came into contact with xylene when they changed motor pumps, and when it was sprayed on felts to clean them before starting the manufacturing process. *See* R.R. at 18a. Bonkowski described that "the fumes were so bad and they stunk so bad you'd be gagging and coughing, you'd have to leave the area . . . ." R.R. at 18a. He recounted that Employer eventually installed an alarm for people to leave areas where xylene was in use. *See* R.R. at 18a. He understood that xylene was removed from the plant after the tank leaked into the well shop and created an environmental hazard in approximately the late 1980s or early 1990s. *See* R.R. at 17a, 19a, 39a-40a. Bonkowski recalled that, although he did not actually witness Bromley with xylene on his clothes, all of the electricians were exposed, and "[Bromley] being on shift longer . . . was probably exposed to it more[.]" R.R. at 19a.

Bonkowski also expressed that the electricians, including Bromley, were exposed to significant amounts of industrial dyes, not only in the large tubs, and through the dispensing hoses, but because dye was splashed everywhere, including on motors, walls, doors, handrails, steps, starters and the floor, and they would touch it

and kneel in it to do their work, particularly in the CCF and napkins area. *See* R.R. at 23a-27a. Bonkowski specifically recalled that silica ash also covered every surface in the CCF, including electrical panels, the dust system, walkways, doorways, floors and even the road due to trucks hauling it to the landfill. *See* R.R. at 28a, 35a. He also asserted that dust from culm (*i.e.*, cheap coal) burned at Employer's facility was "all over the place" in the CCF. R.R. at 29a; *see also* R.R. at 30a.

Bonkowski recounted that, during the 2½ years that he and Bromley worked the same shift:

> A. Well, we worked on brakes together, we worked on cranes together, because we were the two electricians assigned to the main plant. So we were exposed to asbestos dust on the cranes, elevators, brake dust. We pulled cable and wire through the powerhouses and through the basements, asbestos on top of the old pipes, when you pull wire across the pipes the insulation was junky, so as you're wiring upon wire you're cutting into the -- sawing into the asbestos through the old basements and stuff, the old pipe covering.
>
> Q. Did you see any flaking or dust in that atmosphere?
>
> A. Sure.
>
> Q. Where else did you work with him?
>
> A. Well, I mean, we've been all through the bleach plant area. I mean, we've been through -- covered all the calls in the bleach plant, the pulp prep department, in the beaters and allies (ph), and things like that, that's where kind of a lot of the old pumps were resin pumps, stuff like that.

R.R. at 30a-31a.

Bonkowski acknowledged that, although he and Bromley worked in separate areas between 1997 and 2000, and he did not know specifically what day-to-day work Bromley did at that time, Bonkowski was aware of the conditions Bromley was exposed to in the CCF during that time, "because [Bonkowski had] been over

11

there and [the ash was] everywhere." R.R. at 35a; *see also* R.R. at 34a, 36a. Bonkowski also knew that the napkins area where Bromley worked from 2000 until 2005 was approximately 80 by 300 feet in size and contained four machines, one of which dyed the napkins, but since dye was splashed all over the area, Bromley would have been in contact with it, whether he was working on the dye machine or not. *See* R.R. at 44a, 52a-53a.

Bonkowski testified that Employer's electricians were given plastic, accordion-type dust masks to wear, but their use was emphasized only when employees made motor brush changes or worked on brakes, due to carbon dust and asbestos. *See* R.R. at 20a-21a. He also stated that protective clothing and leather gloves were available to the electricians, but that no one really pushed their use or warned that they should not enter a dye area without them, and when they did wear the leather gloves they would get soaked with dye. *See* R.R. at 27a-28a, 41a. Although he remembered Employer providing protective suits at some point, he does not recollect when, and he explained that since they were not rubber, he could not say whether they were water, dye or ink-repellant. *See* R.R. at 41a. In addition, Bonkowski recalled Employer's medical department fit-testing and assigning respirators to the electricians approximately every 12 to 18 months, and the electricians undergoing pulmonary function tests every three years as a condition of their employment. *See* R.R. at 36a-37a. He pronounced that the respirators were used primarily for ash rather than dye exposure. *See* R.R. at 28a, 37a-38a, 41a.

Bonkowski did not believe that he and Bromley were exposed to asbestos or other chemicals during their Sun Ship apprenticeships because the ships were empty steel hulls, and the apprentices were not informed that there was asbestos present. *See* R.R. at 48a-49a. Employer, on the other hand, expressly notified employees that there was asbestos at its facility, and pipes were so marked. *See* R.R.

12

at 48a. Bonkowski represented that he did not witness Bromley smoke during the more than 40 years that he knew him. *See* R.R. at 49a-50a.

Jack Parris (Parris) testified that he has worked for Employer as an electrician since 1969. *See* R.R. at 70a. He confirmed that electricians are responsible for handling any electrical problem throughout Employer's facility. *See* R.R. at 70a. Parris represented that he has known Bromley since 1966, when they worked at Sun Ship together. *See* R.R. at 70a, 97a. He recalled that he and Bromley worked together for Employer from 1973 until 2006. *See* R.R. at 70a-71a. Parris explained that since he worked swing-shift for the past 20 years, he and Bromley worked together at least one-third of the time. *See* R.R. at 95a-97a, 104a. Parris asserted that he and Bromley have had essentially the same job duties, and he observed Bromley at work. *See* R.R. at 71a.

Parris described that he has been exposed to hazardous chemicals for decades while working for Employer, including carbon dust from cranes and motors, asbestos, xylene, bleach, formaldehyde, and dust and liquid dyes. *See* R.R. at 73a-80a. He declared that he and Bromley were exposed to carbon dust while working on cranes, brakes and motors, and asbestos throughout the facility. Parris specifically recalled that xylene was sprayed freely from an 1½ inch hose to clean Employer's machines, which he and Bromley would smell and then experience headaches. *See* R.R. at 75a-77a. He recounted that Employer eventually used an alarm to warn employees to leave areas where xylene was being sprayed. *See* R.R. at 75a. Parris articulated that he and Bromley while working together for Employer were exposed for decades to bleach liquor, formaldehyde and asbestos. *See* R.R. at 76a-79a, 88a. Parris further recollected a time when the electricians were told not to drink water from the central shop fountain because, although it was clean enough to use for processing, the city water may have been mixed with chemicals and sewage. *See* R.R. at 87a-88a.

13

Regarding industrial dye exposure, Parris testified that he and Bromley worked together in the several areas where the dyes were used. Parris described that powder dyes were used in the pulp prep area:

> [W]e had to go in there and change the motors out . . . [and] work on the motor starters and . . . , you go like that, (indicating) tap something you gotta watch because [there] would be [powder dye] dust flying, so you knew you had to be careful when you went in there. Never wore a respirator. They never said wear a respirator . . . , and you'd get it on your hands.

R.R. at 80a.

Parris explained that, although the liquid dye was more contained than the powder dye, the electricians had to work on the pumps under the vats. *See* R.R. at 81a. He related that the liquid dye was all over the machine areas and the walls, and he and Bromley, as the young guys, were sent there together because the older electricians avoided the messy jobs. *See* R.R. at 82a-83a, 107a-108a. Parris recalled that the electricians sometimes wore suits to keep from dirtying their clothes, but no one ever told them not to touch the dye. *See* R.R. at 81a. He maintained that even when the motors were brought to the electricians for service, they were covered in dye that would get on their hands. *See* R.R. at 81a, 106a.

Parris stated that the electricians were not given respirators to work with the dyes. *See* R.R. at 83a, 108a. He specified that employees were only trained to wear their respirators in the CCF for protection from silicone. *See* R.R. at 83a-84a, 108a. Parris noted that he also used his respirator in areas like the coal yard due to the dusty mist, but not if he was simply going there to flip a switch. *See* R.R. at 84a-85a. He confirmed that the electricians were tested and fitted for personal respirators every three years. *See* R.R. at 84a.

Parris also testified that he has worked around Employer's asbestos-covered pipes in the fan houses, attics, ceilings and the electrician's central shop.

14

*See* R.R. at 85a. He represented that the 15 by 15 "motor rec room" where electricians' computers have been located for years, has the highest concentration of asbestos, but since it is not flaking, Employer has yet to close it up. R.R. at 86a.

Parris confirmed that Bromley left shift work in the early 1990s, Bromley and Bonkowski were leaders, Bromley was next assigned to CCF, then to napkins until the equipment was sold and the department closed down in approximately 2000 and Bromley removed the power. *See* R.R. at 89a-91a, 102a-103a. He described that, as a leader between 1993 and 1997, Bromley did mostly office work but, he would have done whatever electrical work was necessary when he worked overtime. *See* R.R. at 91a-92a. Parris stated that Bromley worked in napkins until the last machines were removed within the six months before Bromley left Employer. *See* R.R. at 91a, 93a-94a, 111a. Even without the napkin machines, Bromley was exposed to the remaining dye until his last day of work. *See* R.R. at 111a-112a. Parris concluded that Bromley was exposed to all of the same contaminants that he was exposed to over their decades of working for Employer. *See* R.R. at 88a. Parris admitted that he and Bromley smoked, but less than a pack a day, and he recalled that Bromley quit more than 30 years earlier. *See* R.R. at 99a-102a.

Claimant presented the October 19, 2009 and June 25, 2010 deposition testimony of Barry L. Singer, M.D. (Dr. Singer). Dr. Singer explained that his practice has focused primarily on oncology and hematology over the past 25 years, only 2% to 3% of which has involved bladder cancer because "[i]t's not one of the most common cancers." R.R. at 131a; *see also* R.R. at 134a. In preparation for Bromley's evaluation, Dr. Singer reviewed Bromley's medical records, including his chest x-rays which reflected that Bromley had "asbestos lungs." R.R. at 141a. He also read Claimant's, Parris' and Bonkowski's deposition testimony, Employer's material safety data sheets (MSDS), materials from the National Institute for

Occupational Safety and Health (NIOSH) and the International Agency for Research on Cancer (IARC), and the independent medical evaluation report of Employer's oncology expert Alan J. Lippman, M.D. (Dr. Lippman). Dr. Singer stated that he also reviewed Occupational Safety and Health Administration (OSHA) information, the NIOSH carcinogen list and a KC Safety Tech Library Chemical Index. *See* R.R. at 165a-168a.

Dr. Singer described that any toxins or their byproducts that get into the urine sit in the bladder and damage the transitional epithelium therein, which can lead to metaplasia or dysplasia and, eventually, cancer. *See* R.R. at 140a-141a, 204a. Dr. Singer declared that smoking is the prime cause for approximately 50% of bladder cancer cases, due to benzene in cigarettes, but stated that 20% to 30% of bladder cancers are caused by occupational exposure to chemicals. *See* R.R. at 140a, 142a-143a, 163a-165a, 176a. He stated that workers who are not protected or who use minimum protection are at a higher risk of occupational exposure, unless that work area is 100% sealed. *See* R.R. at 176a-177a, 216a.

Dr. Singer produced abstracts of medical articles he reviewed that link bladder cancer to chemical and asbestos exposure. *See* R.R. at 199a, 221a-231a, 244a-250a, 593a-622a. In particular, in *Occupation and Bladder Cancer Among Men in Western Europe* (2003), higher bladder cancer risks were observed in electrical workers and men employed in industrial chemical manufacturing. *See* R.R. at 244a. In *Bladder Cancer and Asbestos in Spain* (1988), "the results [of a study conducted between 1978 and 1982] showed that bladder cancer is associated with occupational exposure to asbestos." R.R. at 246a. The Italian study summarized in *Occupation and Risk of Bladder Cancer* (1990), "confirm[ed] the well[-]known association between bladder cancer risk and dyestuff production[.]" R.R. at 248a. In *Occupational Exposure to Chemical and Petrochemical Industries and Bladder Cancer Risk in Four Western Canadian Provinces* (2004), the study suggested that

16

there is an increased risk of bladder cancer in workers exposed to asbestos and benzidine over the general population. *See* R.R. at 249a. In *Occupational and Non-Occupational Risk Factors in Bladder Cancer Patients in an Industrialized Area Located in Former East-Germany* (2005), bladder cancer was found to have been overrepresented in patients with occupational exposure to asbestos and chlorinated solvents. *See* R.R. at 250a.

Dr. Singer testified that Bromley's work took him all over Employer's plant, and the portion of MSDS for chemicals used by Employer in areas where Bromley worked since 1995 that he examined[11] reflect that Bromley would have been exposed to multiple carcinogenic compounds. Dr. Singer further explained:

> Asbestos has some relationship to all cancers involving the colon, the bladder, [and] the lung. So less so [sic] in the bladder but certainly has potential to cause damage in conjunction with other irritants.
>
> As a sole exposure, it would be less likely but with [a] combination of exposure with other compounds like

---

[11] Dr. Singer clarified that he did not review all of the (approximately 250-300) MSDS that he was given, because after he located approximately 15 which reflected carcinogenic compounds used at Employer's plant, he "felt it was sufficient." R.R. at 206a; *see also* R.R. at 200a. Dr. Singer identified the following carcinogenic compounds to which Bromley was exposed: ethyleneimine (decorating dye; *see* 1997 request to approve 2-day trial in napkins - R.R. at 251a-254a), butadiene (*see* 1997 MSDS for coupling grease - R.R. at 255a-264a), crystalline silica (*see* 1995 MSDS for quick metal press fit, 1997 MSDS for CCF ash and a conditioning agent, 1999 MSDS for permanent threadblocker, 2004 MSDS for pipe sealant - R.R. at 265a-289a, 333a-340a), nickel compound (*see* 2004 MSDS for petroleum coke - R.R. at 290a-297a), toluene (*see* 1996 MSDS for aerosol spray paint and 1999 MSDS for stencil ink spray - R.R. at 299a-303a, 316a-321a), xylene (*see* 1996 MSDS for aerosol spray paint, 1996 MSDS for xylene and 2001 MSDS for metal and textile markers - R.R. at 304a-309a, 316a-326a), ethylbenzene (*see* 1996 MSDS for xylene - R.R. at 322a-327a), trimethylbenzene (*see* 1996 MSDS for petroleum cleaner - R.R. at 310a-315a), dicholorobenzidene (*see* 2000 MSDS for Bayprint yellow pigment - R.R. at 328a-332a), titanium dioxide (*see* 1995 MSDS for quick metal press fit and 2001 MSDS for metal and textile markers - R.R. at 304a-309a, 333a-340a), and trichloroethylene (*see* 2001 MSDS for lectra clean aerosol - R.R. at 341a-344a). *See* R.R. at 157a, 201a-202a, 206a-215a, 217a, 220a, 251a-344a. He could not determine from the MSDS whether, when or where Employer used those chemicals. *See* R.R. at 217a-218a.

17

benzene and the aniline dyes[, it] certainly would be a co-contributing factor.

R.R. at 144a. Dr. Singer explained that the use of aniline dyes was prevalent in the 1970s and 1980s, and they were used by Employer, but they were mostly discontinued by industries in approximately 1985 after they were known to be carcinogenic. *See* R.R. at 146a, 162a-163a, 214a.

Dr. Singer did not believe that Bromley's brief past smoking history was significant in his developing bladder cancer because the benzene exposure was "not long enough and the exposure was minimal." R.R. at 141a. He did not consider second-hand smoke exposure significant in Bromley's case, since his wife did not smoke, and his father smoked outside. *See* R.R. at 164a.

Dr. Singer represented that because bladder cancer generally occurs later in life, and Bromley was only in his late 50s and did not smoke, his cancer was due to "an intense exposure." R.R. at 146a. He also deemed a significant sign of exposure intensity that Bromley's cancer was in the most advanced stage when it was diagnosed, meaning that it had progressed rapidly and aggressively. *See* R.R. at 146a-147a.

Dr. Singer articulated that, based on the MSDS for the xylene Employer used, the benzene compound ethylbenzene made up 15% of it. *See* R.R. at 143a, 150a. Dr. Singer reflected:

> According to the reports I have read from the chemicals that he was exposed to and the dyes and the silica and asbestos that he was exposed to, [Bromley] had significant exposure to chemicals and potential carcinogens or actual carcinogens while at work at [Employer's facility] and he, according to [his] co-workers, he worked in areas that certainly had exposure to xylene, previously to aniline dyes and certainly he had exposure to asbestos because he had asbestos lungs on [his] chest x-ray.

18

R.R. at 141a. He stated: "[Bromley's] risk factors were . . . primarily the xylene, which contained the 15% benzene, certainly the co-exposure to asbestos and silica, especially the asbestos, [and] also some exposure that he had to the aniline dyes. Those were the three main [sic]." R.R. at 146a. Dr. Singer could not point to any scholarly journal article in which it was concluded that either asbestos, silica or xylene alone could be a substantial factor in the development of bladder cancer. *See* R.R. at 170a, 221a-231a. However, **he concluded within a reasonable degree of medical certainty that Bromley's cumulative exposure to those chemicals at Employer's plant was a substantial contributing factor in his development of bladder cancer and, thus, his death**. *See* R.R. at 148a, 205a-206a, 221a.

Dr. Singer acknowledged that he did not know when or how much xylene was used by Employer during Bromley's employment, or whether Bromley required medical attention for any acute exposures to xylene, silica or asbestos, although it was clear that Bromley's lungs revealed chronic changes due to asbestos exposure and Claimant reported that Bromley experienced occasional rashes and holes in his clothes.[12] *See* R.R. at 153a-154a, 157a, 172a-173a, 213a, 218a-219a.

Employer presented the testimony of its environmental manager Gary Baker (Baker).[13] Baker described that he has been responsible for environmental compliance, industrial hygiene accountability and testing at Employer's Chester plant since 1995. *See* R.R. at 417a-419a, 445a. He explained that, as chemical control coordinator, he has had to review, approve and track all chemicals used in Employer's facility, and he inspects the site approximately once every six months.

---

[12] Dr. Singer also admitted that Bromley's medical records do not reference occupational exposure to chemicals, but explained that he would not expect that there would be any such references in oncology reports because the goal at that point is keeping the patient alive. *See* R.R. at 159a-161a, 175a, 218a-219a.

[13] Baker was a safety, health and environmental coordinator at Employer's corporate center from 1990 to 1995.

*See* R.R. at 418a, 442a-443a, 465a. Baker presented MSDS for dyes used by Employer, some of which date back to the late 1980s, and asbestos abatement and removal records. *See* R.R. at 419a-420a, 437a, 444a, 451a, 460a. Baker reported that he has Employer's monthly chemical use inventory reports dating back only to 1995, and they do not contain cleaning or maintenance chemicals, or oils and greases that everyone uses. *See* R.R. at 464a-465a, 471a.

Baker articulated that since the CCF was built in the mid-1980s, it did not contain asbestos. *See* R.R. at 420a-421a. He stated, however, that the manufacturing facility does contain asbestos and, although a lot of it was removed in the 1980s and early 1990s, there is still asbestos there, which Employer monitors daily. *See* R.R. at 421a-422a, 451a, 455a. Baker explained that although there is less asbestos now, asbestos transite panels used for fireproofing walls remain in the facility. *See* R.R. at 455a, 459a. He added that there are also pipes covered in asbestos that are encapsulated in aluminum, the ends are capped in material and the material is painted over. *See* R.R. at 438a, 455a. Baker expressed that the asbestos could be exposed if someone damages the steam line by cutting through the metal and into the insulation. *See* R.R. at 439a. He claimed that electricians would normally be working on electrical conduit that does not contain asbestos. *See* R.R. at 439a.

Baker related that when employees notify him of asbestos compromise on the premises, an investigation is conducted regarding the cause and the exposure potential then the compromise is either repaired or abated, and the air is monitored to ensure there is no additional exposure risk. *See* R.R. at 424a-425a, 455a-458a, 459a. Based upon his review of the results, Baker confirmed that, after asbestos repairs and removals conducted at Employer's facility, all actual and clearance testing fell below permissible exposure levels.[14] *See* R.R. at 425a-426a.

---

[14] All asbestos clearance testing is conducted by an outside firm. *See* R.R. at 425a.

Baker disclosed that because there is the potential for employee exposure to silica in the facility's boiler 10 and CCF areas (including the office and water treatment areas) due to anthracite coal burning, employees are required to wear respirators in the CCF, particularly in the ash building. *See* R.R. at 426a-427a, 460a.

Baker agreed that Employer's process was very different in 1970 than it is now, and that he has no reason to dispute Bonkowski's or Parris' testimony about xylene being sprayed to clean Employer's mill prior to 1995. *See* R.R. at 449a. He asserted that he has not approved or disapproved Employer's use of xylene, and is not aware of any xylene use at the facility since 1995. *See* R.R. at 429a. He recalled that, since he has worked for Employer, an alarm is sounded to warn people to leave the mill when the cleaning chemicals are being sprayed, but understands that has not always been the case. *See* R.R. at 450a.

Baker claimed that Employer has only used kerosene to fuel small, five-gallon, portable heaters used to heat certain areas of the plant during winter shutdowns. *See* R.R. at 429a-430a. He stated that the heaters are not used in CCF, since the machines generate their own heat. *See* R.R. at 430a. Baker recalled that although the PCB transformers at Employer's facility have been reduced because they impose an environmental hazard, three still exist on-site, which are sealed and regularly checked such that electricians and others who must work on them, are not exposed to PCBs. *See* R.R. at 430a-431a, 461a-462a. He was not aware of any employee reporting PCB exposure since 1995. *See* R.R. at 431a.

Baker reported that "[b]leach liquor refers to . . . the old style of mixing two components together to make . . . concentrated sodium hypochlorite," used by Employer to whiten paper. R.R. at 431a. He confirmed that Employer still uses sodium hypochlorite in the filter plant and in tissue manufacturing but, since at least 1995, a pre-mixed solution is shipped in. *See* R.R. at 431a, 462a, 471a-472a. He reported that neither formaldehyde nor milk of lime have been used in the mill from

21

1995 to the present. *See* R.R. at 438a-440a. Although he recalled concerns being expressed about the drinking water supplied by the Chester Water Authority, he stated that Employer had it tested and confirmed that it "pretty much" matched bottled water and, thus, was potable. R.R. at 433a.

Baker admitted that coal dust exists at Employer's facility in the coal yard, conveyor building and parts of the boiler building, and confirmed that CCF personnel are exposed to the coal yard. *See* R.R. at 431a-432a. Baker acknowledged that paper dust is generated in the paper mill areas of Employer's facility, and where parent rolls are converted to consumer-sized rolls, and some is evident in CCF or where napkins are made. *See* R.R. at 433a.

Baker testified that he reviewed the MSDS for dyes and uncovered that since the late 1980s only one – a bay print yellow – contained aniline and other carcinogens, which was to be trialed for paper towels at Chester in approximately 2000 but, since it was not approved, it was never used. *See* R.R. at 434a-435a, 437a, 451a, 460a, 463a-464a. He recounted that powdered dyes had been used in the pulp prep area of Employer's plant to color tissues, but is not aware of powdered dyes being used in the plant since 1995. *See* R.R. at 436a-437a.

Baker described that industrial dyes, inks, chemicals, silicas and asbestos are still present at Employer's facility, but that employees are trained on safe chemical use, and are instructed regarding what safety equipment is needed for its use. *See* R.R. at 468a, 470a. He stated that employees are required to report potential chemical or other substance exposures to the medical and safety departments. *See* R.R. at 424a, 433a-434a, 458a, 462a. He believed that the expectations are represented in Employer's safety handbook, which has been amended occasionally, and that it falls under employee safety obligations to say no if they are asked to do

22

unsafe work, notify others that are doing unsafe work and report unsafe work.[15]  *See* R.R. at 434a, 466a.

When asked whether there have been chemicals employees routinely worked with since 1995 that were eventually deemed hazardous and removed from use at the facility, Baker replied: "Nothing jumps to mind[.]"  R.R. at 441a; *see also* R.R. at 446a.  He testified that Employer attempts to be proactive and remove chemicals when it becomes known that they are dangerous.  *See* R.R. at 467a-468a. He recalled that he has made recommendations since 1995 to reduce environmental impacts, like reducing volatile organic compounds and paper dust and silica exposure.  *See* R.R. at 446a-447a.

Baker recalled Bromley's name but could not recollect his face, and he admitted that he never directly supervised Bromley or even worked with him, nor did he do the type of work Bromley did for Employer.  *See* R.R. at 443a-444a.

Employer also presented Dr. Lippman's April 7 and May 26, 2010 deposition testimony, which disagreed with Dr. Singer's statements that Bromley had significant exposure to chemicals and carcinogens during his employment.  Dr. Lippman further disputed Dr. Singer's opinion that Bromley's bladder cancer resulted from Bromley's exposure to a combination of chemicals, since there is no literature to support such a conclusion.  *See* R.R. at 503a.  Rather, Dr. Lippman ultimately concluded that Bromley would have suffered from bladder cancer whether he worked at Employer's facility or in a bookstore all of those years.  *See* R.R. at 577a.

The law is well established that "[t]he WCJ is the ultimate factfinder and has exclusive province over questions of credibility and evidentiary weight."  *Univ. of*

---

[15] Baker described that employees undergo regular medical check-ups, and the respirators are fit-tested to each employee.  *See* R.R. at 428a-429a.  He stated that, at least since 1995, employees who do not wear the necessary respiratory protection are progressively disciplined with counseling, verbal reprimands, written reprimands, suspensions and so on, depending upon the number of violations.  *See* R.R. at 427a.

*Pa. v. Workers' Comp. Appeal Bd. (Hicks)*, 16 A.3d 1225, 1229 n.8 (Pa. Cmwlth. 2011). "The WCJ, therefore, is free to accept or reject, in whole or in part, the testimony of any witness, including medical witnesses." *Griffiths v. Workers' Comp. Appeal Bd. (Red Lobster)*, 760 A.2d 72, 76 (Pa. Cmwlth. 2000).

Based upon the evidence presented in the instant case, the WCJ granted the Fatal Claim Petition because Claimant met her burden of proof under Section 301(c)(1) of the Act. In reaching his decision, the WCJ made the following relevant credibility determinations:

> 3. On review, the evidence presented in support of this claim is found credible and persuasive, and is accepted over the defense evidence as there is a conflict. . . .
>
> 4. The testimony and opinions of Dr. Singer are found credible and persuasive. His opinions are accepted over those of Dr. Lippman as there is a conflict. **The testimony of both co-workers ([] Bonkowski and [] Parris), along with the testimony of [Claimant], is found credible and persuasive as their testimony, individually and collectively, support the opinions of Dr. Singer**.
>
> . . . .
>
> 9. [] **Baker's testimony** would negate any significant exposure since 1995; he **did not** however, **dispute the testimony of the two co-workers (e.g., the spraying of xylene previously . . . .), and acknowledged the continued presence of a number of compounds at the facility, such as asbestos, paper dust, and coal dust, and silica exposure . . . . Dr. Singer noted . . . that [] Bromley's work environment subsequent to 1995 (within the last 300 weeks of [] Bromley's employment; he worked until August 2005) exposed him to 'multiple compounds that were carcinogens.' . . . Dr. Singer concluded that the occupational exposure resulted in the bladder cancer**. He testified: ' . . . the total exposure that he had to all these chemicals was the cause of his bladder cancer.'

10. Dr. Singer is well qualified to express relevant opinions in this case. . . .

11. **Dr. Lippman . . . totally negated the workplace as a causal factor in [] Bromley's bladder cancer**. At the same time, he did not seek to specifically identify the cause of the bladder cancer. . . . Given the record of [Bromley's] work duties as an electrician, in various sections of the plant, with associated exposure to carcinogen agents over many years as described by his co-workers ([] Bonkowski and [] Parris), **the opinions of Dr. Singer are found more reasonable and more credible than those of Dr. Lippman on the issue of causation**. This conclusion is strengthened given Dr. Lippman's inability to express any specific opinion as to the cause of [Bromley's] bladder cancer (and even more so, considering that he acknowledged that some 20 percent of bladder cancers are generally accepted to be associated with specific occupational exposures . . . ). Dr. Lippman's . . . challenge [to Dr. Singer's opinions] goes to the weight to be given to Dr. Singer's opinions; the undersigned, in turn, has found Dr. Singer's testimony credible and persuasive, and as noted the more reasonable and credible given the circumstances presented by this record.

WCJ Dec. at 1, 3-4 (emphasis added).

Neither the Board nor the Court may reweigh the evidence or the WCJ's credibility determinations. *Sell v. Workers' Comp. Appeal Bd. (LNP Eng'g)*, 771 A.2d 1246 (Pa. 2001). Specifically, "Section 422(a) [of the Act, 77 P.S. § 834,] does not permit a party to challenge or second-guess the WCJ's reasons for credibility determinations. [Thus, u]nless made arbitrarily or capriciously, a WCJ's credibility determinations will be upheld on appeal."[16] *Pa. Uninsured Emp'rs Guar. Fund v. Workers' Comp. Appeal Bd. (Lyle)*, 91 A.3d 297, 303 (Pa. Cmwlth. 2014) (quoting

---

[16] Capricious disregard "occurs only when the fact-finder deliberately ignores relevant, competent evidence." *Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works)*, 862 A.2d 137, 145 (Pa. Cmwlth. 2004). Capricious disregard, by definition, does not exist where, as here, the WCJ expressly considered and rejected the evidence. *Id.*

*Dorsey v. Workers' Comp. Appeal Bd. (Crossing Constr. Co.),* 893 A.2d 191, 195 (Pa. Cmwlth. 2006)).

On appeal after remand, the Board agreed that substantial evidence supported the WCJ's conclusion that Claimant met her burden under Section 301(c)(1) of the Act.[17]   In particular, the Board declared that "Dr. Singer's testimony, accepted as credible by the WCJ, is unequivocal in attributing [Bromley's] bladder cancer to workplace exposure primarily to xylene, with co-exposure to asbestos and silica and some exposure to aniline dyes." Board Op. at 15.

"As with all claim petitions, the elements necessary to support [a fatal claim petition] award must be established by substantial evidence.   Substantial evidence has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Gibson v. Workers' Comp. Appeal Bd. (Armco Stainless & Alloy Prods.)*, 861 A.2d 938, 943 (Pa. 2004).  Here, although it is undisputed that Bromley's death was due to bladder cancer, the parties do not agree that Bromley's bladder cancer was caused by workplace exposure within the 300 weeks before his death.   Employer specifically contends that the lay witness testimony was insufficient to prove Bromley's alleged workplace exposure, and that Dr. Singer's opinions on causation were based upon an inadequate factual record and lacked scientific or medical basis.

---

[17] We agree with Employer that, in Finding of Fact 11, the WCJ appears to have implied that Employer had a burden to demonstrate an alternative cause for Bromley's cancer (*i.e.*, "[Dr. Lippman] did not seek to specifically identify the cause of the bladder cancer." WCJ Dec. at 3; "Dr. Lippman's inability to express any specific opinion as to the cause of Claimant's bladder cancer[.]" WCJ Dec. at 4). Claimant here had "**a nevershifting burden** of proving not only that [Bromley's] injury arose in the course of his employment but also that the injury was related to it." *Pawlosky*, 525 A.2d at 1211 (emphasis added). However, since other substantial evidence supported the WCJ's conclusion, those references in the WCJ's finding constituted harmless error.

26

### a. Three Hundred-Week Calculation.

In order for a fatal claim to be compensable under Section 301(c)(1) of the Act, an employee's death must occur "within three hundred weeks[18] after the **injury**." 77 P.S. § 411(1) (emphasis added). Accordingly, "[t]his Court has consistently held, without exception, that Section 301(c)(1) [of the Act] denies benefits to a claimant when more than 300 weeks have elapsed between the **commencement of the compensable injury** and the injury-related death." *Whitesell v. Workers' Comp. Appeal Bd. (Staples, Inc.)*, 74 A.3d 297, 300 (Pa. Cmwlth. 2013) (emphasis added); *see also Olsen Bodies, Inc. v. Workmen's Comp. Appeal Bd. (Gavas)*, 573 A.2d 238, 240 (Pa. Cmwlth. 1990) ("there is no recovery for death occurring more than three hundred weeks after a non-occupational disease[-]type injury").[19] However, "[i]t is well settled that for **an injury** to be compensable under the Act, it is not required that the injury resulted from any sudden occurrence or accident; it **may be due to daily trauma** . . . ." *Pittsburgh Steelers Sports, Inc. v. Workers' Comp. Appeal Bd. (Williams)*, 814 A.2d 788, 793 (Pa. Cmwlth. 2002) (emphasis added).

The parties do not cite and our research has not disclosed any reported judicial decision that defines precisely when the "injury" occurs in disease as injury cases under Section 301(c)(1) of the Act. However, David B. Torrey and Andrew E. Greenberg, in *Workers' Compensation: Law & Practice* (3rd ed. 2008), opined: "The commencement date applicable to a disease as injury case [under Section 301(c)(1) of the Act] is appropriately conceived of as the **last date of injurious exposure** to the agent causing the disease, whether or not such last exposure is disabling." *Id.* § 5:19

---

[18] "Three hundred weeks is the equivalent of five years, nine months and one week." *City of McKeesport v. Workers' Comp. Appeal Bd. (Miletti)*, 746 A.2d 87, 89 n.5 (Pa. 2000). The date 300 weeks prior to Bromley's June 23, 2006 death was September 22, 2000.

[19] The Pennsylvania Supreme Court has since stated: "[N]owhere in the Act is there any such phrase as 'occupational disease-like.' An ailment is either an occupational disease or it is not. The quoted phrase is meaningless, and it causes confusion." *Pawlosky*, 525 A.2d at 1210 n.8.

(emphasis added). Specifically, for death claims in disease as injury cases, Torrey and Greenberg declared that if "the employee dies more than 300 weeks after the injury (last injurious exposure to the hazardous condition), then the fatal claim will be barred." *Id.* § 5:20.

Further, in *Kuo-Hom Hsu v. Workers' Compensation Appeal Board (Rohm & Haas)* (Pa. Cmwlth. No. 328 C.D. 2013, filed October 15, 2013), this Court declared that the Board properly required the claimant to

> prove [for purposes of Section 301(c)(1) of the Act] that [the d]ecedent was **exposed to a hazard that caused his** brain **cancer or injury within 300 weeks of his** July 3, 2007 **death**, . . . because, in a death claim, Section 301(c)(1) [of the Act] requires that death occur within three hundred weeks of the injury. 77 P.S. § 411(1).

Slip op. at 3 (emphasis added).[20] Thus, this Court has determined for a fatal disease as injury claim to be compensable under Section 301(c) of the Act, the employee's hazardous **exposure is the injury** from which the 300 week look-back period must be calculated.

Here, the WCJ concluded on remand that

> the instant matter meets the provisions of Section 301(c)(1) [of the Act] as a repetitive/cumulative[-]type injury by way of exposure to carcinogenic agents in the workplace over an extended period of time resulting in bladder cancer and death -- as other repetitive/cumulative[-]type injuries to the muscles/nerves of the body have been found compensable under this provision of the Act.

WCJ Remand Dec. at 3. Indeed, this Court has consistently held that "[a]n injury [under Section 301(c)(1) of the Act] is compensable when it develops over a period

---

[20] We acknowledge that this Court's unreported memorandum opinions may be cited "for [their] persuasive value, but not as a binding precedent." Section 414 of the Commonwealth Court's Internal Operating Procedures, 210 Pa. Code § 69.414. In light of the nearly identical facts of this more recently-decided case, it is cited herein for its persuasive value.

of time and results from a number of work activities in which the employee engaged." *Curran v. Workmen's Comp. Appeal Bd. (Maxwell Indus.)*, 664 A.2d 667, 670 (Pa. Cmwlth. 1995). In such cases, "determinations of the date of injury depend largely on the facts of each case, the purpose for which the injury date must be established, and the medical evidence presented."[21] *Id.* at 671.

Based upon the foregoing, we hold that, in order for Claimant's claim to be compensable under Section 301(c)(1) of the Act, she had to **prove by substantial evidence that Bromley's last exposure to a hazard occurred on or after September 22, 2000.**[22]

---

[21] "**In cumulative trauma cases [under Section 301(c)(1) of the Act], the last day of employment is generally used as the date of injury** for purposes of notice and filing limitations." *Meenan Oil Co., L.P. v. Workers' Comp. Appeal Bd. (Pownall)*, 846 A.2d 793, 795 n.5 (Pa. Cmwlth. 2004) (emphasis added); *see also City of Phila. v. Workers' Comp. Appeal Bd. (Williams),* 851 A.2d 838 (Pa. 2004).

[22] Our conclusion is consistent with proofs required for occupational diseases under Section 301(c)(2) of the Act. Thereunder, if an employee did not file a lifetime benefit claim, his death due to a statutorily-defined occupational disease must occur "within three hundred weeks after the last date of employment in an occupation or industry to which he was exposed to hazards of such disease[.]" 77 P.S. § 411(2); *Ingram v. Workers' Comp. Appeal Bd. (Ford Elecs. & Refrigeration Corp.)*, 940 A.2d 544 (Pa. Cmwlth. 2007).

The Pennsylvania Supreme Court has declared:

> Although Section 301(c)(2) [of the Act] references the employee's 'last date of employment,' 77 P.S. § 411(2), . . . the 300-week period begins on **the last day of employment-based exposure to the hazard**. *See Sporio v.* [*Workmen's Comp. Appeal Bd.*] *(Songer Constr.),* . . . 717 A.2d 525 [] ([Pa.] 1998); *Cable v.* [*Workmen's Comp. Appeal Bd.*] *(Gulf Oil/Chevron USA),* . . . 664 A.2d 1349 [] ([Pa.] 1995) (plurality).

*Tooey v. AK Steel Corp.*, 81 A.3d 851, 870 n.6 (Pa. 2013) (emphasis added); *see also Farr v. Workers' Comp. Appeal Bd. (TRW, Inc.)*, 823 A.2d 1043, 1046 (Pa. Cmwlth. 2003) ("[t]he three-hundred week period prescribed in [Section 301(c)(2) of] the Act is measured from the last date of exposure to the hazard alleged to cause the disease, not from the last date of employment").

**b. Whether a workplace hazard existed to which Bromley was exposed on or after September 22, 2000.**

Relative to WC claims brought pursuant to Section 301(c)(1) of the Act, this Court has declared:

> [**W**]**hether a hazard exists is a question of fact for the [WCJ] to determine**. Furthermore, . . . a claimant's burden of proof related to this issue is not overly demanding. We have also asserted that '[s]ince claimant's exposure is a factual question, **the claimant need not present scientific evidence or expert testimony** to prove the existence of the hazard in the workplace.' *Mauger [&] Co[.] v. Workmen's Comp[.] Appeal B[d.] (Waltz), . . .* 598 A.2d 1035, 1037 ([Pa. Cmwlth.] 1991). '**The [WCJ] may rely solely on the testimony of the claimant or other witnesses to prove the existence of and exposure to the hazard**.' *Id.*

*Gray v. Workmen's Comp. Appeal Bd. (Pittsburgh Bd. of Educ.)*, 657 A.2d 77, 80-81 (Pa. Cmwlth. 1995) (emphasis added).

> As to proof of the existence of the disease-causing element in the work environment, **the courts have accepted lay testimony**, as well as other expert testimony, **to support a finding that the disease-causing element is present**. However, the testimony of a lay person appears to **require testimony of personal experience** with the illness-causing element **and personal knowledge**.

*Craftex Mills, Inc. of PA v. Workers' Comp. Appeal Bd. (Markowicz)*, 901 A.2d 1077, 1080-81 (Pa. Cmwlth. 2006) (emphasis added). Accordingly, **lay testimony of first-hand knowledge of a hazard gained from practical experience can be sufficient to prove the existence of and exposure thereto**. *Gibson*.

Because the WCJ did not have the benefit of Bromley's personal testimony regarding his specific workplace exposures to hazardous chemicals, the law permitted the WCJ to consider and rely upon first-hand lay testimony regarding

30

Bromley's work environment.[23] Claimant testified regarding her personal knowledge that over the years that Bromley worked for Employer, his clothing contained small holes, and was covered in paper dust and dye.

Bonkowski and Parris worked with Bromley as electricians in Employer's Chester plant from 1973 until 2005, they had essentially the same job duties and they observed Bromley at work. Employer's electricians were charged with keeping Employer's entire process running, so they were directly exposed to all areas of the plant, in, under and around the machinery, pipes and elevators. Bonkowski testified from his personal experience that he and Bromley were regularly exposed to industrial oils, bleach, formaldehyde, PCBs, kerosene, milk of lime, bleach, coal ash, silica ash, carbon dust asbestos, and significant amounts of xylene liquid and fumes and industrial dyes over the years since 1973, because coal and silica dust and dyes covered the surfaces of Employer's facility, and that asbestos flakes and dust could be seen in the air. Bonkowski also specifically recalled seeing Bromley with xylene-soaked pants on at least one occasion. Although several of the chemical hazards were abated, and Bonkowski and Parris worked more closely with Bromley before he was assigned to CCF in 1997 and the napkins after 2000, they were aware that Bromley continued to be exposed to coal dust, silica ash and

---

[23] Employer relies upon *Gibson* and *May Department Stores v. Workmen's Compensation Appeal Board (Smith)*, 525 A.2d 33 (Pa. Cmwlth. 1987), to argue that the conclusory lay testimony offered in this case was insufficient to support the WCJ's findings. In *Gibson*, the co-worker's lay testimony was deemed insufficient to establish the decedents' workplace asbestos exposure where the co-worker "simply testified that he saw [the decedent] near a dusty, cottony material that [the co-worker] was unable to identify." *Id.* at 484. In *May*, this Court rejected decedent's doctor's conclusion that the decedent contracted Legionnaire's disease at work, because it was based solely on the doctor's assumptions that since the decedent worked with air-conditioning units, he was exposed to damp environments, and that people who work in damp environments seem to be more susceptible to Legionnaire's disease than the normal population. Bonkowski's and Parris' testimony of first-hand experience with specifically-described chemicals and their personal observations of Bromley's exposure to them makes this case factually distinguishable from *Gibson* and *May*.

industrial dyes in CCF between 1997 and 2000, and significant amounts of dye in napkins from 2000 until he retired.

Baker admitted that Employer's asbestos abatement records and his monthly chemical inventory reports are limited in time, and that the latter do not include the cleaning or maintenance chemicals or oils and greases employees commonly used at the facility. Moreover, since Baker's deposition was conducted before Employer produced the MSDS for CCF and napkins from 1997 through 2005 which reflected that Employer continued to use hazardous chemicals in areas where Bromley was assigned (including xylene containing benzene, despite Baker's representation to the contrary), Baker did not address them. Baker's testimony did not in any way contradict or refute Bonkowski's or Parris' testimony about the continued use of hazardous chemicals or their specific presence in CCF and napkins until 2005. Moreover, Baker confirmed that Employer's employees, including Bromley, during the relevant time period were exposed to silica dust and coal ash, particularly in CCF, to dyes particularly in napkins, and asbestos throughout Employer's premises.

This Court has held:

> 'In performing a substantial evidence analysis, this [C]ourt must view the evidence in a light most favorable to the party who prevailed before the factfinder.' 'Moreover, we are to draw all reasonable inferences which are deducible from the evidence in support of the factfinder's decision in favor of that prevailing party.' It does not matter if there is evidence in the record supporting findings contrary to those made by the WCJ; the pertinent inquiry is whether the evidence supports the WCJ's findings.

*3D Trucking Co., Inc., v. Workers' Comp. Appeal Bd. (Fine & Anthony Holdings Int'l)*, 921 A.2d 1281, 1288 (Pa. Cmwlth. 2007) (quoting *Waldameer Park, Inc. v.*

*Workers' Comp. Appeal Bd. (Morrison),* 819 A.2d 164, 168 (Pa. Cmwlth. 2003)) (citations omitted).

The WCJ made specific findings that the testimony offered by Claimant, Bonkowski and Parris was credible. Baker's testimony did not refute that Bromley was exposed to chemicals while working for Employer after September 22, 2000. *See* WCJ Dec. at 1, Finding of Fact 4; *see also* Finding of Fact 9. Although a significant amount of Claimant's hazardous exposure evidence established that Bromley was regularly exposed to harmful substances throughout Employer's premises between 1973 and 2000, viewing the evidence in Claimant's favor in this case, as we must, we hold that the undisputed lay testimony offered by Bonkowski, Parris and even Baker constituted substantial evidence to support the WCJ's findings of Bromley's exposure to asbestos, silica dust, xylene and dyes in Employer's workplace on or after September 22, 2000.[24]

### c. Whether Bromley's workplace hazard exposure was a substantial contributing cause of his bladder cancer.

"[I]n the case of a fatal claim petition, [the surviving family member has the burden to prove] that th[e] injury or disease was a **substantial contributing cause** in bringing about the death of th[e] employee." *Gibson*, 861 A.2d at 943 (emphasis added). "If the causal connection is not obvious, the connection must be established by unequivocal medical testimony." *Dietz v. Workers' Comp. Appeal Bd. (Lower Bucks Cnty. Joint Mun. Auth.)*, 126 A.3d 1025, 1030 (Pa. Cmwlth. 2015). "[M]edical testimony is unequivocal if a medical expert testifies, after providing foundation for the testimony, that, in his professional opinion, he believes or thinks a

---

[24] Bromley's exposure on Employer's premises during the 40 hours he returned to work in February 2006 is not clear.

fact exists."[25] *Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 80 (Pa. Cmwlth. 2012) (quoting *O'Neill v. Workers' Comp. Appeal Bd. (News Corp., Ltd.),* 29 A.3d 50, 58 (Pa. Cmwlth. 2011)).

Dr. Singer received his medical degree from Johns Hopkins University and is board-certified in internal medicine. He has specialized in oncology (75% of his current practice) since the 1970s, and he has been involved with the treatment of bladder cancer over his 40 years of practice. *See* R.R. at 126a-134a. Based upon his experience and extensive review of Bromley's medical records, the depositions, Employer's MSDS, NIOSH, OSHA and IARC literature and journal articles, he concluded that Bromley's co-exposure to xylene, asbestos, silica and dyes over the years while working at Employer's facility since 1973 until August 11, 2005 was the substantial cause of the bladder cancer from which Bromley died.[26]

---

[25] "The question of whether expert medical testimony is unequivocal, and, thus, competent evidence to support factual determinations is a question of law subject to our review." *Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 80 (Pa. Cmwlth. 2012).

[26] Employer argues that the WCJ erred by overruling Employer's objection that Dr. Singer's June 25, 2010 testimony of a definitive link between asbestos and bladder cancer lacked foundation because Dr. Singer "never established any scientific facts or data based on his own personal knowledge or from any other source[.]" Employer Br. at 53.

"It is well settled that the admission of evidence is within the sound discretion of the WCJ." *Washington v. Workers' Comp. Appeal Bd. (State Police)*, 11 A.3d 48, 59 (Pa. Cmwlth. 2011). "[A] WCJ's determination regarding the admission of evidence will not be overturned without a showing of an abuse of that discretion." *Id.* Further,

[t]he law provides that

expert testimony is incompetent if it lacks an adequate basis in fact. While an expert's opinion need not be based on absolute certainty, an opinion based on mere possibilities is not competent evidence. This means that expert testimony cannot be based solely upon conjecture or surmise. Rather, **an expert's assumptions must be based upon such facts as the jury would be warranted in finding from the evidence**. Accordingly, the Pennsylvania Rules of Evidence prescribe a threshold for admission of expert testimony dependent upon the extent to which the expert's opinion is based on facts and data:

"As this Court has stated on numerous occasions, it is within the [WCJ's] power to determine which medical witness he or she accepts as credible, in whole or in part." *Mauger & Co. v. Workmen's Comp. Appeal Bd. (Waltz)*, 598 A.2d 1035, 1041 (Pa. Cmwlth. 1991).

> The fact that [Dr. Singer's] opinion conflicted with those of [Dr. Lippman] does not make it equivocal. As long as [Dr. Singer] could state, with a reasonable degree of medical certainty, that . . . [Bromley's] condition was caused by his total and cumulative exposures . . . at Employer's place of business . . . , Claimant provided substantial competent evidence to support a finding of causation.

*McGraw Edison Power Sys. v. Workmen's Comp. Appeal Bd. (Kuzior)*, 561 A.2d 1327, 1330 (Pa. Cmwlth. 1989). Here,

> [t]he record discloses that [Dr. Singer] testified with a reasonable degree of medical certainty that [Bromley's bladder cancer] resulted directly from [co-]exposure to [xylene, asbestos, silica and dyes]. Notwithstanding

---

Rule 703. Bases of opinion testimony by experts

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Pa.R.E. 703.

> *Helpin v. Trustees of Univ*[.] *of P*[*a.*]*,* 969 A.2d 601, 617 (Pa. Super. 2009) (citation and quotation marks omitted).

*Gillingham v. Consol Energy, Inc.*, 51 A.3d 841, 849 (Pa. Super. 2012) (emphasis added). Where, as here, Dr. Singer's opinions were based upon his experience and extensive review of Bromley's medical records, the depositions, Employer's MSDS, NIOSH, OSHA and IARC literature and journal articles, there was a foundation for a link between asbestos and bladder cancer and, thus, the WCJ did not abuse his discretion by overruling Employer's objection. *See* R.R. at 199a; WCJ Dec. at 2.

35

> [Employer's] artful cross-examination to induce testimony on the possibility of other etiologies, [Dr. Singer] never recanted h[is] initial assertion of causation and, in fact, reiterated on cross-examination that [Bromley's co-]exposure to [xylene, asbestos, silica and dyes] was the [] explanation for the disease.

*Superior Tube Co. v. Workmen's Comp. Appeal Bd. (Unger)*, 572 A.2d 258, 260 (Pa. Cmwlth. 1990) (footnote omitted).

Here, the WCJ made specific findings that the testimony offered by Claimant, Bonkowski and Parris was credible, and that such evidence individually and collectively supported Dr. Singer's credited testimony that Bromley's workplace hazard exposure was a substantial contributing cause of his bladder cancer. *See* WCJ Dec. at 1, Finding of Fact 4; *see also* Finding of Fact 9. Accordingly, we conclude that the WCJ's findings of fact are supported by substantial record evidence.

Because there is substantial record evidence to support the WCJ's findings that Bromley sustained an injury in the course and scope of employment that caused his death within 300 weeks of his last exposure, the WCJ properly determined that "**Claimant has met the burden of proof required under Section 30[1](c)(1) of the Act**[.]" WCJ Remand Dec. at 3 (emphasis added).

**II.     Whether the WCJ issued a reasoned decision.**

Employer also argues that the WCJ's decision was not reasoned "because the WCJ found that Claimant met her burden of proof on her Fatal Claim Petition, which [Employer] respectfully submits that she did not," and "because, in granting Claimant's Fatal Claim Petition, the WCJ relied upon insufficient evidence to reach his decision" and, finally, "because the WCJ merely adopted Claimant's Proposed Findings of Fact." Employer Br. at 50-51. We disagree.

Section 422(a) of the Act[27] requires a WCJ to issue a decision that permits an appellate court to exercise adequate appellate review. In order to satisfy this standard, a WCJ does not need to discuss every detail of the evidence in the record. Rather, Section 422(a) of the Act requires WCJs to issue reasoned decisions so that this Court does not have to 'imagine' the reasons why a WCJ finds that the conflicting testimony of one witness was more credible than the testimony of another witness.

Although our Supreme Court has held that a WCJ need not explain credibility determinations relating to a witness who testifies before the WCJ, Section 422(a) of the Act requires some explanation of credibility determinations by a WCJ with regard to conflicting deposition testimony in order to enable this Court to review a WCJ's decision. Under Section 422(a) of the Act, a WCJ must articulate the objective rationale underlying his credibility determinations where the testimony of such witnesses is conflicting. **A WCJ may satisfy the reasoned decision requirement if he summarizes the witnesses' testimony 'and adequately explains his credibility determinations**.' *Clear Channel Broad. v. Workers' Comp. Appeal Bd. (Perry),* 938 A.2d 1150, 1157 (Pa. Cmwlth. 2007). Thus, while summaries of testimony alone would be insufficient to satisfy the reasoned decision requirement, **where a WCJ summarizes testimony and also objectively explains his credibility determinations, the decision will satisfy the requirement**. Further, other evidence in the record may provide the objective support necessary under Section 422(a) of the Act for adequate credibility determinations.

*Amandto,* 37 A.3d at 76 (citations omitted; emphasis added).

Here, because the WCJ clearly and extensively summarized the testimony and objectively explained his credibility determinations, we hold that the WCJ issued a reasoned decision in accordance with Section 422(a) of the Act.

Based upon the foregoing, the Board's order is affirmed.

_____
ANNE E. COVEY, Judge

---

[27] 77 P.S. § 834.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kimberly Clark Corporation,      :
           Petitioner      :
                    :
          v.            :
                    :
Workers' Compensation Appeal      :
Board (Bromley),      :    No. 656 C.D. 2016
          Respondent      :

## O R D E R

AND NOW, this 4th day of May, 2017, the Workers' Compensation Appeal Board's March 30, 2016 order is affirmed.


                               _____
                               ANNE E. COVEY, Judge