# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

TA Operating LLC,  
                 Petitioner

           v.

Leonard Maurer (Workers'  
Compensation Appeal Board),  
                 Respondent

:  
:  
:  
:  
:  No. 320 C.D. 2022  
:  SUBMITTED: December 4, 2023  
:  
:  
:  
:

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge  
                HONORABLE LORI A. DUMAS, Judge  
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

## OPINION NOT REPORTED

**MEMORANDUM OPINION BY**  
**SENIOR JUDGE LEADBETTER**           **FILED: January 17, 2024**

TA Operating LLC (Employer) petitions for review of an order of the Workers' Compensation Appeal Board, which affirmed the decision of the Workers' Compensation Judge (WCJ) granting Claimant Debra Maurer's[1] fatal claim petition based on the death of her husband, Leonard Maurer (Decedent). Upon review, we affirm.

Decedent collapsed while at work on Saturday, July 14, 2018, and passed away shortly thereafter. Claimant filed the fatal claim petition seeking widow benefits on January 24, 2020, alleging Decedent's death resulted from a cardiac arrest while in the course and scope of his employment with Employer. Reproduced Record (R.R.) at 5a. Employer filed an answer denying that the cardiac

---

[1] While the record contains different spellings for Claimant's first name, her testimony reflects that the correct spelling is Debra. Reproduced Record (R.R.) at 40a.

arrest was work related, and hearings were held before the WCJ over several days. R.R. at 10a-11a.

Claimant testified that she had been married to Decedent since 1986 and their only child together was no longer a dependent when Decedent passed away. Decedent was 53 years old, 6 feet 1 inch tall, and weighed approximately 220 to 225 pounds at the time of his death. He had never treated with a doctor or taken any medication for heart problems, but had been taking medication for high blood pressure for approximately two years. Decedent smoked cigarettes for as long as Claimant knew him and smoked about a pack a day. He did not exercise and his hobbies were playing pool and shuffle board. He never complained of shortness of breath or chest pains, did not drink alcohol, and was not an anxious person. Claimant was not aware of any heart issues in Decedent's family and was under the impression that his father died of cancer. R.R. at 30a-34a, 37a, 42a-45a, 260a-61a.

Decedent worked full time as a heavy-duty diesel mechanic for Employer for five years, sometimes in excess of 40 hours per week. Claimant testified that Decedent performed road calls on tractor trailers including changing tires and alternators, performing electrical work, and other services along those lines. She later clarified that Decedent performed work both alongside the road for disabled vehicles as well as in Employer's shop, and he was on a road call when he suffered his fatal heart attack. R.R. at 32a-33a, 48a, 260a.

Claimant saw Decedent before he left for work at around 5:30 a.m. and described it as a normal day, with no issues or fighting; however, she noted that it was very hot with temperatures in the 90s. Claimant received a telephone call from Decedent's supervisor around 2:45 p.m. stating only that something had happened

2

to Decedent and Claimant needed to call the police. No autopsy was performed. R.R. at 31a-32a, 34a-35a, 41a, 45a, 260a-61a.

Claimant also presented the testimony of Jermaine Lahr who worked as a diesel technician performing emergency road service for Employer from 2010 to 2017. Lahr worked with Decedent for several years and testified that they held the same job with the same duties. These duties included diagnosing and repairing all forms of commercial vehicles, performing oil changes, and replacing parts such as tires, rims, brakes, and drums. Lahr stated that Employer's shop was open 24/7, 365 days a year. Lahr worked both in the shop and alongside the road, noting that calls for roadside service to fix a flat tire were very common. R.R. at 181a-83a, 261a.

Lahr explained that when responding to a roadside call for Employer, a technician would have to set up a safety zone and then jack the tractor trailer up using a 20-ton jack weighing around 50 pounds and a jack stand weighing another 30 pounds. A tractor trailer tire with a rim weighs between 100 and 125 pounds, depending on the size, and a technician had to carry all of this equipment from the work vehicle to the disabled tractor trailer. After the vehicle was jacked up, a technician had to remove the lug nuts with an air impact gun, which weighed about 30 pounds, and then remove the tire and rim assembly. Lahr testified that sometimes the tires would slide right off, but other times a technician had to pry them off using force. Technicians had to change the tire and rim by hand since Employer did not have machines to accomplish that. All told, it would normally take a technician 30 to 45 minutes to remove a tire from a tractor trailer. R.R. at 183a-85a, 192a, 261a.

Lahr stated that it is a very strenuous job to change a tractor trailer tire, either alongside the road or in the shop, given the weight of the parts and equipment used. Changing a tire roadside in the warmer months adds to the strain because the

3

technician has to deal with the heat coming off the asphalt, which adds around 20 degrees Fahrenheit (° F). Lahr experienced mild bouts of heat illness while working for Employer. In addition, when changing a tire alongside a road, a technician always has to worry about being hit by a passing vehicle and Lahr had lost friends to this type of incident. Lahr stated that this added to the stress level of the job. R.R. at 184a-87a, 192a, 261a-62a.

Lahr understood that on the day in question, Decedent initially responded to a roadside call for one flat tire. Decedent then realized that a second tire needed to be replaced because it did not match up with the new tire, so he returned to Employer's shop for another tire and a brake drum. Lahr explained that Decedent must have taken both tires off before he collapsed because both tires must be removed to be able to see the brake drum. R.R. at 191a-94a, 262a.

On cross-examination, Lahr admitted that he is engaged to Decedent's daughter, with whom he has two children. Lahr had known her for nine years and knew Decedent for seven years. Lahr further admitted that Employer's work vehicles had air conditioning and that Decedent would have been in his air-conditioned work vehicle that day to travel between Employer's shop and the roadside service call. R.R. at 187a-89a, 262a.

Claimant submitted weather data for July 14, 2018, indicating a high temperature of 91° F. R.R. at 226a. She also submitted work orders from Employer documenting the three service calls Decedent worked on that day. R.R. at 205a-12a. The technician comments section of the last work order corroborates Lahr's testimony regarding Decedent removing two tires, observing a cracked brake drum, returning to Employer's shop, and then going back to the roadside call. R.R. at 210a-11a. Also admitted into evidence were the emergency medical services (EMS)

4

records, emergency room records, and documentation of funeral expenses. Notably, the EMS report states that the truck driver at the scene reported Decedent was working on the driver's tractor trailer when Decedent complained of shortness of breath, went back to his service truck, and was then found slumped over in the driver's seat. R.R. at 233a.

Claimant presented the deposition testimony of Jeffrey S. Fierstein, M.D., who is board certified in internal medicine and cardiology. Dr. Fierstein is a non-invasive cardiologist who has been in practice continually since 1983, with his areas of expertise being the diagnosis and treatment of cardiovascular disease as well as preventive cardiology. Dr. Fierstein explained that in a case like this, the items he considers particularly relevant are the patient's background, history, risk factors for cardiovascular disease, whether or not he/she has had prior events, and the circumstances under which the event occurred. R.R. at 63a-64a, 71a-72a, 262a.

Based upon his review of medical records, Dr. Fierstein testified that Decedent had a history of hypertension and smoking, was overweight, and had a family history of cardiovascular disease. He believed that coronary artery disease could be presumed in Decedent's case. Dr. Fierstein explained coronary artery disease as the development of cholesterol plaque within the arteries resulting in some degree of narrowing of those arteries. R.R. at 68a, 262a.

Dr. Fierstein understood that the day in question was particularly hot, about 90° F, when Decedent was called to help change a tire on a disabled tractor trailer. Decedent complained to a bystander that he was short of breath and went to his truck to sit down. He was later found collapsed in his truck and 911 was called. When EMS arrived, Decedent was in cardiac arrest and pulseless. They performed cardiopulmonary resuscitation (CPR), used a defibrillator and intubated Decedent,

5

and then transported him to the hospital.  At the hospital, CPR was continued and Decedent received epinephrine due to the possibility of a pulmonary embolism. Decedent never recovered circulation or a pulse and was subsequently pronounced dead at 3:17 p.m.  R.R. at 69a-71a, 262a.

In short, Dr. Fierstein opined, within a reasonable degree of medical certainty, that Decedent's cause of death was performing significant physical work in a hot environment, that created a condition of myocardial ischemia resulting in a fatal arrhythmia, *i.e.* cardiac arrest.  *See* R.R. at 82a, 263a.  While Dr. Fierstein acknowledged that coronary artery disease probably contributed to Decedent's death, he stressed that Decedent's cardiac arrest and death could have happened in the absence of coronary artery disease and "that the immediate cause, the proximate cause of the event was precipitated by the work he was doing in that hot environment."  R.R. at 95a, 263a.

More specifically, Dr. Fierstein explained that Decedent had a sudden cardiac arrhythmia which was fatal and most likely precipitated by cardiac ischemia, which is insufficient blood flow to his heart muscle.  This could have been caused by either an acute myocardial infarction, meaning an occlusion of a blood vessel that immediately deprived a portion of his heart muscle from the appropriate oxygen and blood, or a severe narrowing of the coronary artery which, when coupled with the increased workload of his activity and the heat, placed stress on Decedent's cardiovascular system creating ischemia.  R.R. at 72a-73a, 262a-63a.  In layman's terms, Dr. Fierstein explained,

> [s]o my conclusion was that the stress of the work that he did in that -- in that environment, the hot environment, the 90-degree weather, so a combination of the extreme workload of changing the tire, which was a strenuous activity, and the hot weather was sufficient to create the

6

> arrhythmia that he died from, and that *that activity and that hot environment was a substantial contributing factor to his death*.

R.R. at 73a (emphasis added).

Dr. Fierstein further testified that the heart muscle is very dependent on getting an adequate supply of oxygen and there is no surplus or stored oxygen that can be called upon to meet increased demands in real time. Heat is a significant stressor on the heart even in the absence of exercise because the heart needs to increase the blood flow to the skin quite a bit in order to cool the body. If you then impose work such as physical labor on top of that hot environment, not only do you have to increase blood flow to the skin, you also have to increase it to the muscles doing the work. R.R. at 73a-75a, 262a-63a. Dr. Fierstein stated that doing heavy work such as changing a tire in a hot environment is

> what you would call a double whammy. You clearly impose a significant workload stress and demand on the heart muscle to increase blood flow to the skin, increase blood flow to the muscle, and at some point, you can exceed the body and the heart's capacity to do that, and it would be a subsequent, you know, failure of the cardiovascular system to occur.

R.R. at 77a-78a. Dr. Fierstein indicated that an autopsy would have been helpful in several respects, including whether Decedent had underlying coronary artery disease, an arrhythmia, or unrecognized cardiomyopathy, and whether he experienced a sudden occlusion precipitated by the physical stress of changing the tire in the heat. R.R. at 81a-82a, 263a.

On cross-examination, Dr. Fierstein acknowledged that while Decedent smoked one pack of cigarettes a day at the time of his death, there was a period of time where he smoked two to three packs a day and that long-term cigarette use is a

7

substantial risk factor for the development of coronary artery disease. R.R. at 84a-85a, 263a. In addition, Dr. Fierstein conceded that Decedent was at the lower end of the obese definition and obesity is a stressor for the heart. R.R. at 85a-86a, 263a. Decedent also had a family history of cardiac issues as his father had coronary artery disease at the age of 59. R.R. at 86a-87a, 263a.

Employer's sole witness was its medical expert, Joseph C. Kraynak, M.D. Similar to Dr. Fierstein, Dr. Kraynak is board certified in internal medicine and cardiovascular diseases, and has been practicing as a non-invasive cardiologist since 1983. Dr. Kraynak testified that while no autopsy was performed, he was almost certain Decedent had coronary artery disease based on his risk factors including family history, high blood pressure, and history of smoking for more than 30 years. *See* R.R. at 133a, 138a, 264a. He further noted that Decedent was obese and led a sedentary lifestyle. Given all of the above, Dr. Kraynak opined, to a reasonable degree of medical certainty, that the substantial contributing factor for Decedent's cardiac arrest was his underlying coronary artery disease, the most common cause of sudden cardiac death. R.R. at 140a-41a, 143a, 264a. Dr. Kraynak did not find Decedent's work to be a substantial contributing factor because the weather or "environmental conditions that day were really unremarkable for that part of the country[,]" and the workload was not unnatural or uncommon for Decedent. R.R. at 142a; *see also* R.R. at 264a. However, like Dr. Fierstein, he conceded that he did not know exactly how much physical labor Decedent performed on the day he died. R.R. at 131a, 142a, 264a.

On cross-examination, Dr. Kraynak admitted that physical exertion can elevate the risk of cardiac arrest. R.R. at 147a, 264a. While he agreed that extreme heat can also contribute to cardiac arrest, he maintained that the temperature on the

day in question was not extreme. R.R. at 150a, 264a. Dr. Kraynak further explained, "I do believe that a normal activity can trigger death in a patient with heart disease[,]" R.R. at 151a-52a, and "I think that what really contributed to his death was coronary artery disease and that basically any activity, including a normal activity at home, could have triggered death." R.R. at 152a; *see also* R.R. at 264a.

On May 5, 2021, the WCJ issued a decision and order granting the fatal claim petition. The WCJ found the testimony of Claimant and Lahr to be credible, and specifically credited the testimony of Dr. Fierstein over the testimony of Dr. Kraynak. The WCJ explained that while Lahr had a personal relationship with Decedent's daughter for years, his testimony was uncontradicted by Employer and was confirmed in part by the work orders. The WCJ also noted that Lahr's admission that Decedent would have been riding in an air conditioned work vehicle to and from the roadside call demonstrated that Lahr's testimony was not false or exaggerated due to his personal relationships. R.R. at 265a.

As for the medical experts, the WCJ explained that much of their testimony was similar as they both believed Decedent had underlying coronary artery disease based upon his smoking, high blood pressure, and family history. Both doctors also recognized that while obesity is not an independent risk factor for coronary artery disease it could have come into play. The main difference in their testimony had to do with the ultimate issue here, whether the work Decedent performed that day had any role in his sudden cardiac arrest and death. The WCJ credited Dr. Fierstein's opinion on this issue because his understanding that Decedent had to change a tractor trailer tire alongside the road was confirmed through the work orders as well as the testimony of Lahr regarding the considerable weight of the equipment involved to do so. Dr. Fierstein also acknowledged the

9

significance of the temperature that day coupled with the stress of the work being performed. The WCJ rejected Dr. Kraynak's testimony on this issue because, while he testified that normal activity could trigger death in a patient with coronary artery disease, he did not believe Decedent's work on the day he died was a factor in his death because it was not abnormal. R.R. at 265a-66a. Given the above, the WCJ determined that Claimant met her burden of proving that the work Decedent performed for Employer on the day he died was the substantial contributing factor in his sudden cardiac arrest and death and she was therefore entitled to benefits. Employer then appealed to the Board, which affirmed.

On appeal to this Court, Employer argues that the Board erred in affirming the WCJ's decision because Dr. Fierstein's expert opinion regarding the cause of Decedent's cardiac arrest is premised on facts not contained in the evidentiary record and, therefore, is incompetent as a matter of law. Specifically, Employer complains that the record fails to contain evidence regarding the work Decedent was allegedly performing immediately preceding his cardiac arrest. We disagree.

With a claim petition generally, "a claimant bears the burden of proving all the necessary elements for an award of workers' compensation benefits." *Holy Redeemer Health Sys. v. Workers' Comp. Appeal Bd. (Lux)*, 163 A.3d 498, 503 (Pa. Cmwlth. 2017). In the specific context of a fatal claim petition, the surviving family member must demonstrate, by substantial evidence, the elements necessary to merit an award. *City of Phila. v. Workers' Comp. Appeal Bd. (Kriebel)*, 29 A.3d 762, 769 (Pa. 2011). These elements are "establishment of a work-related injury," "impact on the earning capacity of the employee," and that the injury "was a substantial

10

contributing cause in bringing about the death of that employee." *Id.* (quotation omitted).

As this Court has further explained,

[j]ust as with any other type of injury, in order for a decedent's fatal heart attack to be compensable, the claimant must establish that the heart attack was causally related to the decedent's employment. *Yantos v. Workmen's Comp*[.] *Appeal B*[*d.*] *(Vulcan Mold & Iron Co*[.]*)*, [] 563 A.2d 232, 236 ([Pa. Cmwlth. ]1989). If the causal connection is not obvious, the connection must be established by unequivocal medical testimony. *Lamoreaux v. Workmen's Comp*[.] *Appeal B*[*d.*] *(Celotex Corp*[.]*)*, [] 497 A.2d 1388, 1390 ([Pa. Cmwlth. ]1985).

*Dietz v. Workers' Comp. Appeal Bd. (Lower Bucks Cnty. Mun. Auth.)*, 126 A.3d 1025, 1030 (Pa. Cmwlth. 2015). "Medical evidence is considered unequivocal if the medical expert, after providing a foundation, testifies that in his medical opinion, he thinks the facts exist." *Craftsmen v. Workers' Comp. Appeal Bd. (Krouchick)*, 809 A.2d 434, 439 (Pa. Cmwlth. 2002). Of particular importance in this matter, "[a]n expert witness is permitted to base an opinion upon facts of which he has no personal knowledge, so long as those facts are supported by evidence in the record." *Dietz*, 126 A.3d at 1031 (citing *Yantos*, 563 A.2d at 235).

Here, Dr. Fierstein based his testimony upon his understanding that Decedent was working in 90-degree weather changing a tractor trailer tire alongside a road when he reported feeling short of breath and subsequently collapsed in his work vehicle. These are uncontradicted facts of record, found in the credible testimony of Claimant and Lahr, and corroborated by the weather report, the EMS records, and Employer's own work orders. While Dr. Fierstein admitted that he did not know specifically how far into the tire change Decedent got before he collapsed,

11

this is of no moment and does not render his opinion equivocal. Our courts have repeatedly rejected the argument in cardiac arrest cases that a claimant needs to prove exactly what the decedent was doing prior to the event.

> Our Supreme Court has explained that "where a decedent was performing his or her *usual job assignment* at the time of the fatal heart attack, and the connection between the work and the heart attack was supported by competent medical testimony, decedent's claimant was entitled to compensation." [*Workmen's Comp. Appeal Bd. v.*] *Bernard S. Pincus Co.*, 388 A.2d [659,] 663 [(Pa. 1978)] (emphasis added). Where exertion leads to a fatal heart attack, there is no need to pinpoint the exact work duty which caused the exertion. *Plumbers Contractors, Inc. v. Workmen's Comp[.] Appeal B[d.] (Lewellyn)*, [] 402 A.2d 555, 557 ([Pa. Cmwlth. ]1979). In other words, "[i]t is not necessary to prove and identify the precise work details which caused a heart death that resulted from decedent's exceptional work activity." *P[a.] State Oral Sch[.] v. Workmen's Comp[.] Appeal B[d.] (Gerek)*, [] 475 A.2d 175, 178 ([Pa. Cmwlth. ]1984).

*Dietz*, 126 A.3d at 1031.

Just as in *Dietz*, "[i]t is undisputed that Decedent had a very physical job[,]" and that "[h]is daily job [duties] involved strenuous physical activity." 126 A.3d at 1032. It is further undisputed that Decedent was responding to a roadside service call for a flat tire on a tractor trailer at the time of his death, and that this type of call was within his usual job duties. Dr. Fierstein unambiguously opined that the immediate cause of Decedent's cardiac arrest and death was performing this significant physical work in a hot environment. The WCJ specifically credited Dr. Fierstein's testimony and opinion in this regard over Employer's expert. As the ultimate factfinder with "exclusive province over questions of credibility and evidentiary weight[,]" the WCJ "is free to accept or reject, in whole or in part, the

12

testimony of any witness, including medical [experts]." *Kimberly Clark Corp. v. Workers' Comp. Appeal Bd. (Bromley)*, 161 A.3d 446, 461 (Pa. Cmwlth. 2017) (quotations omitted).

In sum, evidence of how much and what type of activity Decedent was performing that day is not a prerequisite to compensation. *Dietz*; *Lewellyn*; *Bernard S. Pincus*. Decedent was performing his usual job assignment at the time of his cardiac arrest and the connection between his work and his death is supported by Dr. Fierstein's competent medical testimony. Accordingly, we affirm.

 

**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

TA Operating LLC,            :
          Petitioner      :
                                       :
        v.                         :    No. 320 C.D. 2022
                                       :
Leonard Maurer (Workers'         :
Compensation Appeal Board),     :
          Respondent    :

# **O R D E R**

AND NOW, this 17th day of January, 2024, the Order of the Workers' Compensation Appeal Board is AFFIRMED.

 

 

_____
**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita