J-A03009-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: W.C.B. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: P.S.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 999 WDA 2023 |

Appeal from the Order Entered August 1, 2023
In the Court of Common Pleas of Cambria County Orphans' Court at
No(s):  2023-400-IVT

BEFORE:  BOWES, J., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY BOWES, J.:                    **FILED: March 14, 2024**

P.S.B. ("Father") appeals from the August 1, 2023 order granting the petition filed by A.L.D. ("Mother") and her husband E.R.D., Jr. ("Husband"), which involuntarily terminated Father's parental rights to his son, W.C.B., born in December 2010, pursuant to 23 Pa.C.S. § 2511(a)(1) and (b).[1]  After careful review, we affirm.

We glean the factual and procedural history of this matter from the certified record.  Mother and Father were together at the time of W.C.B.'s birth and later married in 2012.  **See** N.T., 6/7/23, at 8.  Their relationship

---

[1]  Mother also has an older daughter with another man who was eighteen years old at the time of the termination hearing in this case.  Additionally, Husband has two pre-teen daughters from a previous relationship.  Mother and Husband also have a son who was born in February 2023.  Father also has an adult son who lives in his residence.  None of these individuals testified in, or were otherwise directly implicated by, the case at bar.

deteriorated over the ensuing years, however, and the couple separated in 2020. *Id*. at 9. In the immediate aftermath of their separation, Mother and Father maintained an informal custody arrangement whereby Mother exercised primary physical custody of W.C.B., while Father enjoyed regular periods of partial physical custody. *Id*. at 10, 26-27, 46. Both parents resided in Johnstown, Pennsylvania, approximately "two or three" miles from each other. *Id*. at 61.

W.C.B. is an active youth athlete who competes in an interstate traveling hockey league that includes regular events in Pennsylvania, Ohio, Michigan, and New York. *Id*. at 7, 15, 43. Initially, Father was a regular spectator at W.C.B.'s hockey games, including out-of-state matches. *Id*. at 41-44.

Mother and Father divorced in October 2021. *Id*. at 9. They contemporaneously executed a stipulated custody agreement that largely preserved the existing status quo, *i.e.*, Mother maintained primary physical custody of W.C.B. while Father exercised periodic periods of partial physical custody based upon the "mutual agreement" of the parties. *Id*. at 18. The agreement also provided for shared legal custody of W.C.B. *Id*. at 35.

In November 2021, Father was briefly hospitalized after demonstrating suicidal ideations. *Id*. at 33-34. Post-divorce finances also quickly became a source of conflict between the parties, with Father being detained by bench warrants for non-payment of child support on at least three separate

occasions.  *Id*. at 42-43, 54-55.  Disputes also arose concerning the costs associated with W.C.B.'s hockey league.  *Id*. at 60.

Contemporaneous with their separation, Mother met Husband, whom she married in December 2021.  *Id*. at 5-6.  During the six months following the marriage, Father's relationship with Mother and W.C.B. rapidly deteriorated.  Father eventually ceased communicating with Mother altogether and their last conversation occurred in June 2022.  *Id*. at 11-12, 60-61.  In July 2022, Father had his last in-person interaction with W.C.B., when the child attended a birthday party at Father's home.  *Id*. at 10.  Father ceased attending W.C.B.'s hockey games after October 2022.  *Id*. at 43-44, 48. W.C.B. also increasingly failed to respond to Father's text messages and phone calls.  *Id*. at 13-14.  Father and W.C.B. last communicated during a phone call in January 2023.  *Id*. at 50.

On March 29, 2023, Mother and Husband filed a joint petition seeking to involuntarily terminate Father's parental rights pursuant to § 2511(a)(1) and (b).  The orphans' court held a termination hearing on June 7, 2023, at which time W.C.B. was twelve years old.  Therein, the orphans' court heard testimony from Mother, Husband, Father, and Father's ex-girlfriend, Angelina Darr.  Although W.C.B. was not in attendance and did not testify, his court-appointed counsel, Suzann Lehmier, Esquire, participated in the proceeding

and reported to the orphans' court that the child favored termination and adoption by Husband.[2] *See* N.T., 6/7/23, at 78-80.

On August 1, 2023, the orphans' court filed an order involuntarily terminating Father's parental rights pursuant to § 2511(a)(1) and (b), which also contained a summary of the court's rationale. Father filed a timely notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Thereafter, the orphans' court filed a brief opinion pursuant to Rule 1925(a)(2)(ii), which referred to the reasoning already set forth in its original order.

Father has raised the following issues for our consideration:

(1)    Whether the trial court committed an error of law in terminating the parental rights of [Father] to W.C.B.?

(2)    Whether the trial court abused its discretion in terminating the parental rights of [Father] to W.C.B.?

---

[2]  Attorney Lehmier served as W.C.B.'s "court-appointed counsel" in these proceedings pursuant to 23 Pa.C.S. § 2313(a). Scheduling Order, 3/30/23, at 1 (unpaginated). From the available record, it is unclear whether the orphans' court intended for Attorney Lehmier to represent W.C.B.'s legal interests, best interests, or both. Nonetheless, Attorney Lehmier reported there was no conflict between W.C.B.'s best and legal interests, which the orphans' court credited in rendering its determination. *See* Order, 8/1/23, at ¶ 7; N.T., 6/7/23, at 78. Accordingly, we observe no structural defect in the instant case. *See Interest of K.N.L.*, 284 A.3d 121, 151 n.23 (Pa. 2022) (providing that appellate court must perform limited *sua sponte* review of termination of parental rights decisions to confirm orphans' court's appointment of legal counsel and express ruling regarding conflict between best and legal interests) (citing *In re Adoption of K.M.G.*, 240 A.3d 1218, 1236 (Pa. 2020)).

Father's brief at 6.[3]

The basic parameters of our appellate review are well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. Where the orphans' court's factual findings are supported by the evidence, an appellate court may not disturb the orphans' court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa.Super. 2022) (cleaned up).

---

[3] In this Court, Attorney Lehmier filed a brief advocating that we affirm the order involuntarily terminating Father's parental rights.

The involuntary termination of parental rights is governed by § 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id*. at 830; *see also* 23 Pa.C.S. § 2511(a)(1)-(11). Termination is proper when the moving party proves grounds for termination under any subsection of § 2511(a), as well as § 2511(b). *In re Adoption of T.B.B.*, 835 A.2d 387, 395 (Pa.Super. 2003). Instantly, we consider § 2511(a)(1) and (b), which provide as follows:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
> >
> > . . . .
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

In order to establish sufficient grounds for termination pursuant to § 2511(a)(1) the petitioner must demonstrate by "competent, clear and convincing evidence" that the parent against whom termination is sought has, "by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." *In re Adoption of C.M.*, 255 A.3d 343, 363-64 (Pa. 2021) (cleaned up). While the Adoption Act does not define the term "parental duties,"

> our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance[,] and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life.

*In re Adoption of L.A.K.*, 265 A.3d 580, 592 (Pa. 2021) (cleaned up). Furthermore, "[f]ortitude is required, as a parent must act with 'reasonable firmness' to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities." *Id.* at 592 (cleaned up).

In assessing § 2511(a)(1), trial courts should consider the entire history of the case and avoid applying the statutory six-month requirement mechanically. *See C.M.*, 255 A.3d at 364. However, the General Assembly's emphasis on the six months immediately preceding the filing of the

termination petition indicates this timeframe is the "most critical period for evaluation" of a parent's conduct. *L.A.K.*, 265 A.3d at 592.

Our Supreme Court has long maintained that "the question of whether a parent has failed or refused to perform parental duties must be analyzed in relation to the particular circumstances of the case." *In re Burns*, 379 A.2d 535, 540 (Pa. 1977). Thus, "even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months. . ., the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination [of parental rights]." *L.A.K.*, 265 A.3d at 593 (cleaned up). The totality of the circumstances includes consideration of, *inter alia*: (1) the parent's explanation for his conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b). *Id*. The purpose of this approach is to "avoid a mechanical application of the law regarding the termination of parental rights." *Id.*

With these overarching legal principles in mind, we turn to Father's putative claims for relief. *See* Father's brief at 10-22. Although framed as separate legal questions, we discern that Father's two lines of arguments constitute a unitary challenge to the sufficiency of the orphans' court's findings

pursuant to § 2511(a)(1). *See* Father's brief at 14 ("From the record developed on June 7, 2023, there can be no doubt of [Father's] efforts to maintain a place of importance in his child's life . . . ."). Specifically, Father argues that the orphans' court ignored evidence indicating that he had attempted to maintain contact with W.C.B. during the months immediately preceding the filing of the termination petition. *Id*. at 10-20.

The orphans' court did not credit Father's arguments and concluded that he had failed to follow through on visits and maintain reasonable contact with W.C.B. beginning in July 2022. *See* Order, 8/1/23, at ¶ 5. Furthermore, the court found that Father had failed to take any action when confronted with W.C.B.'s refusal to respond to Father's attempts at cellular communication. *Id*. Accordingly, the orphans' court found that termination was warranted pursuant to § 2511(a)(1). *Id*. at ¶ 2. The certified record supports the orphans' court's conclusion.

There is no dispute amongst the parties concerning the timeline of events in this case. As detailed above, the testimony at the termination hearing indicated that Father ceased having in-person contact with W.C.B. in July 2022. *See* N.T., 6/7/23, at 10. The parties also agreed that Father stopped attending W.C.B.'s sporting events in October 2022. *Id*. at 14, 43-44, 48. Finally, there is no dispute that Father and W.C.B. last spoke in January 2023, after which all communication between them ended. *Id*. at 20, 50. Accordingly, there is no reasonable dispute that during the critical six-

month period immediately preceding the filing of the instant termination petition, Father was meaningfully absent from W.C.B.'s life.

Father contended that his lack of contact with W.C.B. was entirely caused by Mother allegedly blocking him on her phone to hinder his ability to exercise custody and forbidding Father from attending W.C.B.'s hockey games or approaching Mother's home. *Id*. at 48-49, 52-54. Mother denied Father's allegations and averred that Father, himself, elected to directly contact W.C.B. to schedule custody time. *Id*. at 11-12, 19. She averred without contradiction that she had never denied Father visitation when he had directly contacted her or W.C.B.[4] *Id*. at 19. Moreover, Mother testified that it was long-standing custom that Father would coordinate his visits directly with W.C.B. *Id*. at 29.

Our review also indicates that Father's testimony on this point is inconsistent and contradictory. Although Father asserts without corroboration that Mother blocked his phone number and will not accept any communications from him, he simultaneously claimed that he had not called Mother's phone number in "years" and, consequently, could not know whether his number was blocked. *Id*. at 60-61. Furthermore, Father's testimony indicated that his increasing lack of contact with W.C.B. was at least partially due to Father losing his cell phone for a period and failing to obtain a

---

[4] On one occasion, Father apparently requested a visit with W.C.B. through a third party who contacted Mother on her cell phone. *See* N.T., 6/7/23, at 12-13. Mother averred that she blocked that phone number summarily because it was unfamiliar. *Id*.

replacement. He stated, "Well, until – when – until I lost my phone. I'd text him or talk to him all the time." *Id*. at 50-51. Additionally, Father also testified that his lack of contact with W.C.B. was attributable to "miscommunications" that occurred in "finalizing plans" due to Father electing to contact W.C.B. and then failing to follow-up on that initial contact. In short, he credited the miscommunications to "dealing with an [eleven or twelve] year old [child]." *Id*. at 59.

From this testimony, we can reasonably deduce that Father faced obstacles to maintaining his place in W.C.B.'s life, including his deteriorating relationship and communication with Mother, his inability to follow through on planning visitations with W.C.B., and even everyday annoyances like the loss of a cell phone. Critically, however, the record is bereft of any indication that Father has responded to these impediments to his relationship with his son with the kind of "affirmative actions" and "reasonable firmness" that Pennsylvania law mandates. *See L.A.K.*, 265 A.3d at 592.

Aside from claiming to have sent "dozens" of text messages and phone calls to W.C.B., Father has taken no actions in response to the ongoing lack of contact between him and his son. *See* N.T., 6/7/23, at 54. Despite living within just a few miles of W.C.B., Father admitted that, beyond periodic telephone calls during the fall and winter of 2022, he has made no attempts to contact W.C.B. in person since July of 2022, eight months before Mother filed the petition to terminate Father's parental rights. *Id*. at 60-62. Even

assuming, *arguendo*, that Mother was engaged in an inappropriate attempt to deny Father his custody rights, Father conceded in his testimony that he has taken no actions to overcome those obstacles and exercise his rights. *Id*. at 52.

Finally, we observe that Father's passivity is not merely confined to matters regarding physical custody. Despite having equally shared legal custody of W.C.B. with Mother, the testimony at the termination hearing revealed that Father did not play an active role in decisions regarding W.C.B.'s education or health. *Id*. at 30. On this point, Father conceded that he did not seek any independent information from W.C.B.'s school concerning his participation in sports or activities. *Id*. at 62-63.

Based upon the foregoing, we observe no abuse of discretion or error of law in the orphans' court's findings pursuant to § 2511(a)(1). Specifically, the record supports its conclusion that Father failed to perform parental duties during the six months immediately preceding the filing of the petition by Mother and Husband. Consequently, Father's claims merit no relief.

We note that Father has failed to present any arguments concerning the orphans' court's findings pursuant to § 2511(b) in his brief. *See* Father's brief at 10-22. Our case law provides that such an omission results in waiver of any argument concerning the overlooked subsection of § 2511. *See In re M.Z.T.M.W.*, 161 A.3d 462, 465-66 (Pa.Super. 2017). However, out of an

abundance of caution, we will briefly review the orphans' court's findings pursuant to § 2511(b) and explain why there is no abuse of discretion.

Section 2511(b) requires that the court "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). Of note, we "should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023). Moreover, this determination "should not be applied mechanically," but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." *Id*. at 1106. Thus, there is no "exhaustive list" of factors that must be considered. *Id*. at 1113 n.28. While the particular facts of each case determine the factors to be considered, our precedent indicates that relevant points of inquiry include "intangibles such as love, comfort, security, and stability." *In re T.S.M*., 71 A.3d 251, 267 (Pa. 2013).

Our Supreme Court has mandated, however, that an evaluation pursuant to § 2511(b) should consider the child's bond with his or her parent. *See In re E.M.*, 620 A.2d 481 (Pa. 1993). Specifically, we must render "a determination of whether the bond is necessary and beneficial to the child[.]" *In the Interest of K.T.*, 296 A.3d at 1113. This evaluation involves consideration of the effect of severing the child's bond with their parent. *Id*. at 1109. In termination matters, "severance of a necessary and beneficial

- 13 -

relationship is the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." *Id*. at 1109-10 (quoting *E.M.*, 620 A.2d at 484). Our Supreme Court has distinguished, however, "extreme emotional consequences" from a mere "adverse impact" in the termination context. *Id*. at 1111. Specifically, the High Court has cautioned that Pennsylvania courts must not truncate their analysis and preclude severance "based solely on evidence of an 'adverse' or 'detrimental' impact to the child." *Id*. at 1114.

Instantly, the orphans' court determined that W.C.B. did not enjoy a strong bond with his Father and that termination would not have an undue detrimental effect upon the child. *See* Order, 8/1/23, at ¶¶ 3, 6. Conversely, the orphans' court found that W.C.B. shared a strong parental bond with his putative adoptive father, Husband. *Id*. at ¶ 4. Finally, the orphans' court concluded that termination would best serve W.C.B.'s developmental, physical and emotional needs, and welfare. *Id*. at ¶ 8. There is ample support for these findings.

First we note that Father testified that he no longer has a meaningful parental bond with W.C.B. *See* N.T., 6/7/23, at 61. Father's testimony was also corroborated by Attorney Lehmier, who reported on W.C.B.'s behalf that his relationship with Father had "really deteriorated." *Id*. at 79.

It is equally clear that W.C.B.'s true parental relationships lie with Mother and Husband, who are identified as consistent sources of support and

encouragement for W.C.B. *Id*. at 38. Husband, in particular, spoke highly and warmly of W.C.B. during his testimony. *Id*. at 38 ("We get along greatly. I admire the boy. Very [energetic] young man. Great potential. Does well in school. Does well in sports. I want the best for him."). Most tellingly, W.C.B. reported through his legal counsel that he was in favor of termination of Father's parental rights in anticipation of adoption. *Id*. at 78. W.C.B.'s preference is particularly relevant in this case because, as a twelve-year-old child, his consent to the adoption is required pursuant to § 2711(a)(1).

For all of these reasons, the orphans' court did not abuse its discretion or commit legal error in concluding that the termination of Father's parental rights would not sever a beneficial and necessary parent-child relationship, or cause W.C.B. undue harm. Accordingly, the certified record supports the orphans' court's finding that termination would best serve W.C.B.'s developmental, physical, and emotional needs and welfare. *See* 23 Pa.C.S. § 2511(b).

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 03/14/2024

- 15 -