J-S20031-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: N.M.K., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.D.Y., MOTHER | : : : : : : : | |
| | : | No. 152 MDA 2024 |

Appeal from the Decree Entered January 10, 2024
In the Court of Common Pleas of Franklin County Orphans' Court at
No(s):  45-ADOPT-2023

BEFORE:   OLSON, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED: SEPTEMBER 4, 2024**

M.D.Y. ("Mother") appeals the January 10, 2024, decree involuntarily terminating her parental rights to her natural daughter, N.M.K. (hereinafter, "Child"), born in April 2021.[1]  We affirm.

We glean the relevant factual and procedural history of this matter from the certified record.  Franklin County Children and Youth Services ("CYS" or "the Agency") first became involved with Mother and her family on July 2, 2022, when it received a General Protective Services ("GPS") referral regarding Mother's heroin addiction.  **See** CYS Exhibit 6 at 1.  At that time, Mother and Child were residing informally at the home of Mother's sister-in-

---

[*] Former Justice specially assigned to the Superior Court.

[1]  Child's biological father, S.K. ("Father"), passed away in August 2020 from a drug overdose.  **See** N.T., 1/9/24, at 120; CYS Exhibit 7 at 1.

law's parents, C.T. ("Foster Father") and J.T. ("Foster Mother") (collectively, "Foster Parents") in Waynesboro, Pennsylvania.[2]  *See* Notes of Testimony ("N.T."), 1/9/24, at 7-8, 116.  Police responded to the residence in response to the GPS referral but Mother fled on foot, while leaving Child in the care of Foster Parents.  *See* CYS Exhibit 6 at 1.  On July 5, 2022, the Agency contacted Mother and, ultimately, instituted a safety plan pursuant to which Mother "was not to have unsupervised contact" with Child and provided that Foster Parents would act as chaperones.  *See id.*; *see also* N.T., 1/9/24, at 9.

The same day, however, the Agency received a Child Protective Services ("CPS") referral alleging that Mother was "creating a reasonable likelihood of harm to [Child] by placing or leaving controlled substances within [Child's] reach and potentially exposing [Child] to them."  CYS Exhibit 6 at 1.  The ensuing investigation revealed that Mother left "drugs and paraphernalia" within Child's reach, including in their shared bedroom.  *Id.*  Ultimately, the CPS report was determined to be indicated for child abuse.  *See id.* at 2.

Between July 2022 and August 2022, Mother was resistant to providing drug screens and tested positive for, *inter alia*, cocaine and fentanyl on the two separate occasions when she agreed to submit a sample.  *See* N.T., 1/9/24, at 9-10; CYS Exhibit 6 at 2.  On August 31, 2022, CYS sought and

---

[2]  The record indicates that no closer, more-appropriate kinship resources were located and approved.  Of note, Child's maternal grandmother was rejected as a potential kinship resource due to her twice testing positive for "controlled substances not prescribed to her."  *See* CYS Exhibit 6 at 2.

was awarded emergency protective custody of Child, which was confirmed at a shelter care hearing held one day later. On September 16, 2022, Child was adjudicated dependent and placed in pre-adoptive kinship care with Foster Parents. *See* N.T., 1/9/24, at 34. Child's primary permanency goal was established as reunification, with a concurrent goal of adoption. *See id.* at 12; *see also* CYS Exhibit 6 at 3. Mother did not appeal.

In furtherance of reunification, Mother was ordered to: (1) submit to a parental fitness assessment; (2) achieve financial stability and obtain stable housing; (3) consistently participate in visits with Child; (4) maintain her sobriety and participate in drug and alcohol treatment; and (5) cooperate with regular and random drug screenings. *See* CYS Exhibit 6 at 3-4. In permanency review orders filed between February and August 2023, the trial court consistently found that Mother had completely failed to comply with any of these objectives. *See* CYS Exhibits 9-11.

In general, Mother failed to maintain adequate contact with the Agency regarding her status and progress. *See* CYS Exhibit 9 at 1; CYS Exhibit 10 at 1; CYS Exhibit 11 at 1. Specifically, the certified record indicates that Mother began a Family Assessment for Service and Treatment ("FAST") evaluation through Alternative Behavior Consultants ("ABC") in November 2022. *See generally* CYS Exhibit 7. Mother failed, however, to follow-through with the psychological component of her FAST assessment and ABC closed the referral and evaluation unsuccessfully. *See id.* at 4. Mother's abuse of narcotics also

continued. In October 2022, she tested positive for cocaine, fentanyl, methamphetamines, and opiates. **See** CYS Exhibit 9 at 2.

Mother's visits with Child were initially supervised by Foster Parents in their home, although these were quickly discontinued due to safety concerns after she began making threats against Foster Parents.[3] **See** N.T., 1/9/24, at 68-69. Thereafter, Mother's visits were briefly supervised by ABC. **See id.** at 20, 69. In approximately October 2022, however, Mother was discharged from ABC's visitation program due to concerns about her behavior. **See id.** at 20-21. Mother's visits were then transferred to the Children's Aid Society ("CAS"), which similarly discharged her on December 13, 2022, due to Mother's repeated failures to participate in visitations or communicate appropriately. **See id.** at 21-22. Mother's last in-person visit with Child through CAS occurred on October 27, 2022. **See id.** at 25.

In January 2023, the Agency learned that Mother was homeless and had relocated to the State of Maryland.[4] **See id.** at 23, 25; **see also** CYS Exhibit 9 at 2. Consequently, Mother's interactions with her then-two-year-old daughter were entirely limited to weekly supervised video calls through Zoom.

---

[3] During her incomplete FAST evaluation, Mother alleged that Foster Parents had conspired to plant narcotics on her person. **See** CYS Exhibit 7 at 1.

[4] We note that Child was born in Maryland. There is no question, however, that she and Mother were residing in Pennsylvania at the time that CYS was awarded emergency protective custody. **Accord** 23 Pa.C.S. § 2302(1)-(2).

*See id.* at 25-26. Between October 27, 2022, and the filing of the termination petition *sub judice*, Mother had no further in-person contact with Child.[5]

Mother began in-patient substance abuse treatment in Maryland through Foundation in January 2023. *See* N.T., 1/9/24, at 88. She was discharged after a few weeks, however, due to her having unpermitted sexual contact with another patient. *See id.* at 89, 122-23. Thereafter, Mother began treatment through a different in-patient facility, Second Chance, but was unsuccessfully discharged from that program in February 2023 after it was discovered that she was pregnant. *See id.* at 88-89. In April 2023, Mother enrolled in Helping Up Mission for Women and Children ("Mission"), which is a one-year, inpatient treatment program geared towards pregnant women. *See id.* at 86-90. Mother's new child was born in approximately November 2023. *See id.* at 93. Mother was not scheduled to complete her course of treatment through Mission until April 2024. *See id.* at 92.

On September 18, 2023, CYS filed a petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (8), and (b).[6]

---

[5] Mother visited in-person with Child during Christmas of 2023, which was supervised by Foster Parents in their home. *See* N.T., 1/9/24, at 27.

[6] On September 15, 2023, the orphans' court appointed Kristen B. Hamilton, Esquire, to serve as Child's legal interest counsel ("LIC") pursuant to 23 Pa.C.S.A. § 2313(a). *See* Order of Court, 9/15/23, at 1. Prior to the initiation of termination proceedings, Attorney Hamilton had served as Child's guardian *ad litem* ("GAL") during the above-described dependency proceedings. On September 20, 2023, Attorney Hamilton submitted a motion for appointment
*(Footnote Continued Next Page)*

The trial court held a hearing on January 9, 2024, at which point in time Child was two years old. Therein, the Agency adduced testimony from CYS caseworker Kyle Jeffries and introduced into evidence various documents related to Child's dependency proceedings. Mother was represented by counsel and, although she appeared late for the hearing, she also testified on her own behalf. *See* N.T., 1/9/24, at 15.

---

of dual representation, wherein she requested that the orphans' court appoint her to represent Child as a dual GAL/LIC. *See* Motion for the Appointment of Dual Representation, 9/21/23, at ¶¶ 1-17. Specifically, she reported her conclusion that Child was too young to comprehend these legal proceedings and, consequently, was incapable of expressing a "legal interest," or preferred result in these termination proceedings. *See id*. at ¶ 9; *see also Interest of H.H.N.*, 296 A.3d 1258, 1264 (Pa. Super. 2023) ("In the context of TPR proceedings, the child's "legal interests" is synonymous with "the child's preferred outcome[.]"). Accordingly, Attorney Hamilton requested that she be appointed to also serve as Child's GAL so that she could simultaneously represent Child's best interests in these legal proceedings. *Accord H.H.N.*, 296 A.3d at 1264 ("[W]here there is no conflict between a child's legal and best interests, an attorney-[GAL] representing the child's best interests can also represent the child's legal interests."). On September 22, 2023, the orphans' court granted Attorney Hamilton's request after concluding that "no conflict exists" precluding dual representation. Order of Court, 9/22/23, at 1.

We commend Attorney Hamilton's approach to this situation by proactively drawing the orphans' court's attention to a potential issue concerning Child's representation. We observe no structural error under these circumstances. *See In re Adoption of K.M.G.*, 663 Pa. 53, 79-84, 240 A.3d 1218, 1234-36 (Pa. 2020) (mandating "limited" *sua sponte* review by appellate courts to ensure children are appointed counsel in contested termination matters and the court has "determined that the child's best interests and legal interests" do not conflict in cases where a single attorney serves as dual GAL/LIC); *see also In re T.S.*, 648 Pa. 236, 257, 192 A.3d 1080, 1092-93 (Pa. 2018) (holding that "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal," then the mandate of § 2313(a) "is satisfied where the court has appointed an attorney-guardian *ad litem* who represents the child's best interests during such proceedings.").

- 6 -

On the same day as the hearing, the orphans' court filed a decree involuntarily terminating Mother's parental rights pursuant to Section 2511(a)(2), (8), and (b). On January 29, 2024, Mother filed a timely notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Thereafter, the orphans' court submitted an opinion pursuant to Rule 1925(a)(2)(ii).[7]

Mother has raised the following issue for our consideration: "Whether the [orphans'] court errored [sic] in determining that [Mother's] parental rights should be terminated[?]" Mother's Brief at 7. We discern that Mother's arguments are solely confined to challenges to the orphans' court's findings

_____

[7] In its Rule 1925(a)(2)(ii) opinion, the orphans' court noted that it was inhibited from setting forth its reasoning for terminating Mother's parental rights due to her counsel's failure to timely request transcripts in conformity with Pa.R.A.P. 1911(a). *See* Orphans' Court Opinion ("O.C.O."), 2/23/24, at 3. On March 12, 2024, this Court ordered Mother's counsel to order the pertinent transcripts and directed the orphans' court to file a supplemental certified record. *See* Order, 3/12/24, at 1. All parties appropriately complied. However, no supplemental Rule 1925(a)(2)(ii) opinion was prepared.

In some circumstances, "[t]he absence of a trial court opinion poses a substantial impediment to meaningful and effective appellate review." ***Commonwealth v. McBride***, 957 A.2d 752, 758 (Pa. Super. 2008). We note, however, that the orphans' court's January 9, 2024 decree sets forth extensive factual and legal findings that explained its rationale for terminating Mother's rights in exacting detail. *See* Decree, 1/9/24, at 1-9. Furthermore, no party has asserted that it has been prejudiced by the absence of an opinion from the orphans' court. Under these circumstances, we decline to find waiver. ***See***, ***e.g.***, ***Interest of R.R.D.***, 300 A.3d 1077, 1080-81 (Pa. Super. 2023) (holding that the absence of a Rule 1925(a)(2)(ii) opinion specifically addressing an appellant's allegations of errors did not result in waiver where the court's earlier filings adequately addressed the arguments on appeal).

pursuant to Section 2511(a)(2) and (8), while declining to discuss the court's conclusions pursuant to Section 2511(b). *See id.* at 15-21.

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant

- 8 -

termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines that the petitioner has established grounds for termination under at least one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (Pa. 2013). This Court need only agree with the orphans' court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights. *See M.E.*, 283 A.3d at 830 (citing *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*)).

Our analysis in this case implicates Section 2511(a)(8) and (b), which provides as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of

- 9 -

environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

In order to satisfy Section 2511(a)(8), the petitioner must prove that: (1) the child has been removed from the parent's care for at least 12 months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa.Super. 2018). Section 2511(a)(8) does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the child. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa.Super. 2017). Rather, our inquiry is focused upon whether the at-issue "conditions" have been "remedied" such that "reunification of parent and child is **imminent** at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa.Super. 2009) (emphasis added). "[A] child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. We cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *Id.* at 11-12 (internal citations and quotation marks omitted).

Finally, this Court has also explained that,

- 10 -

while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa.Super. 2008) (*en banc*).

If a petitioner establishes adequate grounds for termination pursuant to § 2511(a), we then turn to § 2511(b), which requires that the court "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Our Supreme Court has generally outlined this inquiry, as follows:

[C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.

Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

- 11 -

The extent, however, of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (cleaned up). Rather, it is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." *M.E.*, 283 A.3d at 839 (cleaned up). This Court has clarified that it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents. *Id.* We will not disturb such an assessment if the orphans' court's factual findings are supported by the record. *Id.*

We now turn to Mother's arguments pursuant to Section 2511(a)(8), which assert that the orphans' court abused its discretion in concluding that termination was warranted despite an alleged lack of clear and convincing evidence. *See* Mother's Brief at 19. Specifically, Mother argues that the orphans' court failed to consider "her efforts to gain and maintain sobriety which is the reason for her incapability to be a parent." *Id.* We disagree.

In the findings issued in its termination decree, the orphans' court concluded that: (1) Child had been removed from Mother's care for at least twelve months; (2) the conditions that originally led to Child's removal continued to exist, *i.e.*, Mother's ongoing struggle with addiction and substance abuse; and (3) that termination would best serve Child's needs and welfare. *See* Decree, 1/9/24, at 1-8. Our review of the certified record reveals more-than-sufficient evidentiary support for the court's findings.

Preliminarily, we note that there is no dispute that Child has been removed from Mother's care for more than the minimum of twelve months required pursuant to Section 2511(a)(8). As detailed above, Child was removed from Mother's care on August 31, 2022, meaning that she had been in the Agency's care for approximately sixteen months at the time of the termination hearing. Thus, the first prong of Section 2511(a)(8) is met.

Turning to the second element of Section 2511(a)(8), we note that the records from Child's dependency proceedings generally confirm that Child was removed from Mother's care due to concerns about Mother's parental fitness, the stability of her housing and finances, and her abuse of illegal narcotics. **See generally** CYS Exhibit 6, 9-11. Mr. Jeffries similarly testified that Mother's substance abuse and stability problems were the primary concern that motivated the Agency to seek emergency custody of Child. **See** N.T., 1/9/24, at 7-10, 71. During her incomplete FAST evaluation, Mother conceded that she abused narcotics, especially opioids. **See** CYS Exhibit 7 at 1. Similarly, Mother testified at the termination hearing that she had a serious drug problem at the time of Child's removal. **See** N.T., 1/9/24, at 96.

Mother does not dispute that she was suffering from debilitating stability and drug problems at the time of Child's removal. She contends, however, that her successful enrollment in Mission demonstrates that she has essentially "turned a corner" and finally become serious about her sobriety. **See** Mother's Brief at 20 ("Mother argues that the conditions that led to the

- 13 -

removal and placement no longer exist since she is now sober and able to parent."). As a threshold matter, however, we find that Mother's arguments have misapprehended the nature of termination pursuant to Section 2511(a)(8). In this context, we are precluded from considering Mother's willingness or ability to remedy the conditions that led to Child's removal at some indeterminate date in the future. *See M.A.B.*, 166 A.3d at 446. Rather, to preclude termination the record must demonstrate that Mother's reunification with Child was "**imminent**" at the time of the termination hearing. *I.J.*, 972 A.2d at 11 (emphasis added).

Contrary to Mother's arguments, our review of the certified record indicates that Mother still had substantial issues to address and significant steps to take in order to reunify with Child. Mother averred that, between January 2023 and February 2023, she was unsuccessfully discharged from two separate treatment facilities due to her failure to abide by the programs' respective guidelines. *See* N.T., 1/9/24, at 88-89. Mother testified that, thereafter, she enrolled with Mission in April 2023, where she still had approximately three months of treatment remaining at the time of the termination hearing in January 2024. *See* N.T., 1/9/24, at 92 (indicating that Mother would prospectively "graduate" from Mission in April 2024). Furthermore, Mr. Jeffries testified that Mother's progress with respect to treatment and sobriety is entirely self-reported. *See id.* at 66, 80 ("We sent out the request to the providers, but didn't get anything back.").

As set forth above, even Mother's self-reported history of treatment in Maryland was largely inconsistent and indicated that she was still struggling to master her addiction. Indeed, Mother's own testimony indicated that she only decided to change her ways for the sake of her children on Christmas 2023, *i.e.*, approximately two weeks prior to the termination hearing. **See id.** at 106-07. At best, Mother's claim that she would complete treatment at Mission was speculative. To the extent Mother represents that she had fully addressed her substance abuse issues at the time of the termination hearing, the certified record does not support such a conclusion.

Even assuming, *arguendo*, that Mother successfully completed her treatment through Mission, Mr. Jeffries explained that, given the length of time that had elapsed since Mother absconded from the Commonwealth, she would need to undergo renewed assessments for substance abuse and parental fitness by a provider affiliated with the Agency. **See id.** at 65-67. Moreover, Mr. Jeffries averred that Mother would then need to follow whatever recommendations resulted from that evaluation in order to begin the process of reunification. **See id.** at 65-67, 72. Furthermore, Mother's own testimony revealed that she still needed to achieve financial stability and secure appropriate housing. **See id.** at 92-93 (indicating that Mother was unemployed and would need to begin paying rent to remain in the housing provided by Mission in April 2024).

Based upon the foregoing, we find ample evidence to support the orphans' court's finding that the conditions which led to the removal of Child still exist. Accordingly, the second element of Section 2511(a)(8) is also met.

Finally, we consider the third and final prong of Section 2511(a)(8), which requires an assessment of whether termination would best serve the needs and welfare of Child. The most revealing and definitive testimony on this point was from Mother herself, wherein she testified as follows:

> [CHILD'S GAL/LIC:] Obviously, at the end of the day the most important thing before this [c]ourt is the best interest of [Child].
>
> So, do you believe that it's in her best interest to continue to wait another six months for you to be stable?
>
> [MOTHER:] I want her with me now. Technically, she could come to [Mission] with me now.
>
> THE COURT: Do you think that's what's in her best interest?
>
> [MOTHER:] I know she has school and everything.
>
> THE COURT: I want you to answer my question. Do you think it's in her best interest to come live with you today?
>
> [MOTHER:] No.
>
> THE COURT: Why not?
>
> [MOTHER:] Because she's going to school. I know she's stable right now. She has routine. . . .

*Id.* at 130-31. Mother's testimony also reveals she has no concerns about Foster Parent's care of Child. *See id.* at 126 ("I know she's taken care of.").

Mother's conclusion on this point is further buttressed by Mr. Jeffries' testimony, which indicates that Foster Parents were adequately providing for

- 16 -

Child's basic and emotional needs. *See id.* at 34-36. In general, Mr. Jeffries opined that termination would be in Child's "best interests" given the comparative stability offered by Foster Parents. *See id.* at 37.

Based upon the foregoing, we readily conclude that the third and final element of Section 2511(a)(8) is also satisfied. Accordingly, we affirm the orphans' court's conclusion that Mother's conduct warranted termination.

As noted above, Mother declined to include any discussion or argument concerning Section 2511(b) in her brief to this Court. *See* Mother's Brief at 2-21. Our case law provides that such an omission results in mandatory waiver of any argument concerning the overlooked subsection of Section 2511. *See*, *e.g.*, *In re M.Z.T.M.W.*, 161 A.3d 462, 465-66 (Pa.Super. 2017) To the extent that Mother intended to advance a challenge to the orphans' court's findings pursuant to Section 2511(b), it is waived.

Out of an abundance of caution, however, we will briefly review the orphans' court's findings pursuant to Section 2511(b). Specifically, the orphans' court found that termination of Mother's rights would best serve the developmental, physical and emotional needs and welfare of Child, then two years old. *See generally* Decree, 1/9/24, at 4-6. Our examination of the certified record reveals ample support for this finding.

With respect to the bonding analysis mandated by our Supreme Court, we emphasize that Mr. Jeffries testified that Mother had no physical contact with Child between October 2022 and December 2023. *See* N.T., 1/9/24, at

- 17 -

25-27. Mr. Jeffries also indicated that Mother's attempts to communicate with Child during their weekly supervised Zoom video calls were not always successful due to Child's young age and her understandable lack of attention span. *See id.* at 59-60. In her testimony, Mother claimed that she and Child still share a close bond. *See id.* at 134 ("She still loves me and wants to be with me. She says it on the phone."). In the absence of any evidence aside from Mother's own testimony speaking to the existence of a parental bond between her and Child, we note that, "[i]n cases where there is no evidence of any bond between the parent and the child, it is reasonable to infer that no bond exists." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008).

Assuming, *arguendo*, that Mother and Child still share some manner of bond despite the dearth of meaningful contact between them, the testimony from Mr. Jeffries indicated that Child's closest emotional and true parental bond is with Foster Parents, who had been providing her with critical everyday care, support, love, and affection for half of her life at the time of the termination hearing. *See id.* at 33-36. In particular, he reported that Child regularly looks to Foster Father for safety and emotional support in moments of uncertainty. *See id.* at 36-37.

This testimony, coupled with the relevant analysis above under Section 2511(a)(8), fully supports the orphans' court's findings pursuant to Section 2511(b). We observe no abuse of discretion or error of law in the orphans' court's conclusion. Thus, we affirm the underlying termination decree.

Decree affirmed.


Judgment Entered.


_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary


Date: 9/04/2024